PEOPLE v COY

Docket No. 238112. Submitted June 11, 2003, at Lansing. Decided August 7, 2003, at 9:00 A.M.

Laurence D. Coy, on retrial before a jury in the Calhoun Circuit Court, Conrad J. Sindt, J., was convicted of voluntary manslaughter and was sentenced to twenty to thirty years of imprisonment. The defendant's prior conviction of second-degree murder regarding the instant crime had been reversed by the Court of Appeals, TALBOT, P.J., HOOD and GAGE, J.J., on the basis of an error in the admission of testimony regarding deoxyribonucleic acid (DNA) evidence. 243 Mich App 283 (2000). The defendant appealed, arguing that the trial court erred in admitting evidence of statistical analysis of DNA evidence, and by failing to grant the defendant's motion to adjourn trial in order to procure a witness and to complete testing of a another potential suspect's DNA. The defendant also argued that his sentence was disproportionate.

The Court of Appeals *held*:

1. The trial court did not abuse its discretion by admitting expert testimony regarding the statistical analysis of the DNA profiles obtained from the mixed blood samples taken from the crime scene in this case, which profiles revealed that neither the defendant nor the victim could be excluded as contributors to the blood samples. The expert testimony was properly admitted under MRE 702. The methods used to calculate the statistics, the likelihood ratio and the probability of exclusion or inclusion calculation, are generally accepted in the scientific community, although their use in the field of forensic genetics is relatively new. Moreover, statistical evidence of DNA is generally admissible because challenges to its scientific acceptability or sufficiency are relevant to the weight of the evidence, not its admissibility.

2. Testimony by the victim's roommate that the victim told her that defendant would be coming to the victim's apartment on the night of her death, and that the victim asked the roommate to page the defendant to remind him of his promise to visit, although hearsay, was properly admitted under MRE 803(3), as relevant evidence of the victim's intention or plan to meet the defendant at her apartment on the night of her death. Because this testimony was admit-

ted pursuant to a firmly rooted hearsay exception, the defendant's unpreserved argument that its admission violated his Confrontation Clause rights under the federal and state constitutions is without merit. US Const Am VI; Const 1963, art 1, § 20.

3. An adjournment of trial may be granted on a showing of good cause and diligence. MCR 2.503(C). The defendant's request for an adjournment, made on the day of trial, in order to look for a certain witness who allegedly would provide impeachment testimony, was properly denied because the defendant made no effort to locate the witness before the trial, despite having the witness's address. Similarly, the defendant's request for an adjournment to allow time to complete DNA testing of another suspect's blood was properly denied. The defendant never sought an order from the trial court to require such testing, and the defendant admitted that he never properly requested the DNA testing, and acknowledged that this suspect was located only a week before trial. Moreover, it was unlikely that the testing would have assisted the defendant's case, because that suspect had an alibi. The defendant demonstrated neither the good cause nor the diligence necessary for an adjournment.

4. The defendant's sentence is not disproportionate. The defendant had a criminal record that included three misdemeanors and two felony convictions, and had problems with substance abuse as well as having an admitted bad temper. The victim died as a result of numerous stab wounds, and the crime was committed while young children were present in the apartment. Under the circumstances, the defendant's sentence is proportionate to the seriousness of the offense and his prior record.

Affirmed.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *John A. Hallacy*, Prosecuting Attorney, and *Jennifer Kay Clark*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Peter Jon Van Hoek*) for the defendant.

Before: MARKEY, P.J., and SAAD and WILDER, JJ.

PER CURIAM. Defendant Laurence D. Coy was originally convicted in 1998 of second-degree murder, MCL 750.317, and sentenced to forty to sixty years'

imprisonment. This Court reversed defendant's conviction and remanded for a new trial. *People v Coy*, 243 Mich App 283; 620 NW2d 888 (2000). On retrial, a jury convicted defendant of voluntary manslaughter, MCL 750.321; he was sentenced to twenty to thirty years' imprisonment as a third-offense habitual offender, MCL 769.11. Defendant appeals by right, asserting that the trial court erred by admitting evidence and by not granting an adjournment to permit additional deoxyribonucleic acid (DNA) testing. Defendant also claims that his sentence is disproportionate. We affirm.

Defendant first argues that the trial court erroneously admitted evidence of statistical analysis of DNA profiles developed from mixed blood samples found at the crime scene. Specifically, he claims that the methods used to interpret the results of the mixed DNA samples were not sufficiently appropriate and scientifically acceptable to justify admission of the test results. We disagree. A trial court's decision to admit evidence is reviewed for an abuse of discretion. *People v Herndon*, 246 Mich App 371, 406; 633 NW2d 376 (2001).

In our prior opinion, we found that the admission of evidence that defendant's DNA profile was consistent with DNA profiles from mixed blood samples was plain error warranting reversal because no testimony illuminated the statistical significance of a potential match. *Coy, supra* at 301. Neither defendant nor the victim could "be excluded as a possible contributor" to the mixed blood samples recovered from a broken knife blade found in the victim's bedroom and from the victim's bedroom doorknob. *Id.* at 293. Anita Matthews, a forensic serologist and the associate director

of forensic identity testing at Laboratory Corporation of America in North Carolina (Lab Corp) testified that " 'once we determine that two samples could have come from the same source then we could calculate a statistical estimate to give a likelihood of how common or how rare it is to find that set of characteristics in another individual.' " *Id.* at 293-294. However, Matthews did not offer such testimony at defendant's initial trial because Lab Corp's " 'policy is we do not calculate statistical estimates for mixed samples.' " *Id.* at 294. The evidence also showed that the police investigated several suspects other than defendant, including the victim's roommate, Kristina McKee. *Id.* at 285, 308. We concluded that "absent some analytic or interpretive evidence concerning the likelihood or significance of a DNA profile match, Matthews' testimony concerning the potential match between defendant's DNA and the DNA contained in the mixed blood samples found on the knife blade and the doorknob was insufficient to assist the jury in determining whether defendant contributed DNA to the mixed sample." *Id.* at 301. We did not, however, prescribe the specific manner in which the extent or meaning of a potential match is to be expressed, but merely held that "some qualitative or quantitative interpretation must accompany evidence of the potential match." *Id.* at 302.

At defendant's retrial, Megan Clement, a Technical Director at Lab Corp, testified regarding the statistical significance of the potential match of the DNA profiles from the mixed blood samples and also presented evidence of additional DNA testing: McKee and two other suspects were excluded as possible contributors with respect to all the evidentiary items. The parties also

stipulated that a fourth person was excluded as a possible DNA contributor to the mixed blood samples taken from the knife blade and the bedroom doorknob.

Before the retrial, the trial court held an extensive evidentiary hearing to decide the admissibility of the statistical analysis offered by the prosecutor concerning the mixed DNA evidence. The trial court recognized Clement as an expert, and she testified concerning Lab Corp's use of proficiency testing to ensure reliable DNA results. It was determined that the sample taken from the knife blade had DNA from more than one contributor because multiple loci showed three characteristics.[1] Neither defendant nor the victim could be excluded as contributors because characteristics of the mixed sample on the knife blade were contributed by either defendant or the victim. Thus, no evidence existed that anyone other than defendant and the victim contributed to the mixed sample.

Testing of the mixed sample found on the victim's bedroom doorknob produced reportable results at five loci. The doorknob sample, like the knife blade sample, clearly contained a mixture of DNA from more than one person. The DNA profiles of the victim and defendant were compared against the profile from the doorknob. Neither the victim nor defendant could be excluded as contributors. Again, the characteristics in the doorknob sample were shared by the victim or defendant. Therefore, like the sample from the knife blade, the evidence pointed to only two contributors.

---

[1] A person has only two characteristics at each locus or area of DNA, one contributed from the mother and one from the father.

Before the end of the year 2000, Lab Corp did not calculate statistical ratios for mixed sample DNA. In July 2000, the DNA Advisory Board endorsed two methods for calculating statistical ratios for mixed samples: the likelihood ratio and the probability of exclusion or probability of inclusion calculation. The FBI had developed a computer program using accepted statistical methods to replace handwritten probability calculations used with samples containing mixed DNA contributions.

Clement testified that Lab Corp followed the recommendation of the DNA Advisory Board and used the FBI computer program to calculate the probability of inclusion or exclusion statistical ratios regarding the mixed sample found on the knife blade. Clement testified that the combined probability of selecting an unrelated individual who could be included as a contributor to the mixture was 1 in 1,210 for the African-American population, 1 in 952 for the Caucasian population, 1 in 1,115 for the Southeastern Hispanic population, and 1 in 916 for the Southwestern Hispanic population. Clement further testified that the combined probability of exclusion was that 99.17 percent of the African-American population would be excluded as contributors to the mixture of DNA found on the knife blade. Hand calculations confirmed the accuracy of the computer calculations.

A likelihood ratio was also calculated for the mixed sample obtained from the knife blade. The sample from the knife blade was 164,000 times more likely to be a mixture of the victim's and defendant's DNA than to be a mixture of the victim's and an unknown African-American person's DNA, 868,000 times more likely to be a mixture of the victim's and defendant's DNA

than to be a mixture of the victim's and an unknown Caucasian person's DNA, 1.03 million times more likely to be a mixture of the victim's and defendant's DNA than to be a mixture of the victim's and an unknown Southeastern Hispanic person's DNA, and 944,000 times more likely to be a mixture of the victim's and defendant's DNA than to be a mixture of the victim's and an unknown Southwestern Hispanic person's DNA.

Clement also testified concerning the probability of inclusion or exclusion with respect to the doorknob sample. The probability of randomly selecting an unrelated individual who could be included as a contributor was 1 in 319 for the African-American population, 1 in 260 for the Caucasian population, 1 in 444 for the Southeastern Hispanic population, and 1 in 350 for the Southwestern Hispanic population. The combined probability of exclusion supported the conclusion that 99.68 percent of the African-American population would be excluded as potential contributors to the mixed DNA.

The likelihood ratio method was also used for statistical calculations regarding the mixed sample on the doorknob. Two alternative hypotheses were used. One was that the mixture derived from the victim and defendant, and the other was that it came from the victim and an unknown contributor. The sample from the doorknob was 3,100 times more likely to be a mixture of the victim's and defendant's DNA than a mixture of the victim's and an unknown African-American's DNA. It was 1,870 times more likely to be a mixture of the victim's and defendant's DNA than a mixture of the victim's and an unknown Caucasian person's DNA, and was 11,700 times more likely to be from the victim and the defendant than from the vic-

tim's and an unknown Southeastern Hispanic person, and was 6,720 times more likely to be a mixture of the victim's and defendant's DNA than a mixture of the victim's and an unknown Southwestern Hispanic person.

Clement testified very specifically that two databases are used to calculate statistics and explained each carefully. Clement also testified that the statistical calculations at issue are not novel or new and are used in many areas other than forensics. While Clement agreed that the use of these statistical estimates was new to forensic laboratories, she explained that statisticians have used these statistical estimates for years to report statistics for mixture calculations. Because the forensic science community has endorsed them, laboratories now embrace statistical calculations for mixed contributor samples. The FBI's computer program has also been accepted by the scientific community and approved by statisticians and human geneticists. Clement testified that the two calculations used to calculate the statistics in this case are generally accepted in the scientific community in the field of statistics.

Dr. Frederick Bieber, a medical geneticist employed by the Harvard Medical School and the Brigham and Young Women's Hospital, also testified as an expert at the evidentiary hearing. Bieber explained likelihood ratios, their acceptance, reliability, and how they are used in many areas of science other than forensic DNA or forensic genetics. Bieber was on the DNA Advisory Board when it published its strong endorsement of the statistical calculations for mixed samples and which the director of the FBI approved for use in statistical estimation in forensic DNA work. The Michigan

State Police has adopted one of the two calculations as an interim protocol for mixed DNA samples. Bieber believed that between twenty and thirty states were using the combined probability of exclusion/inclusion calculation for mixed DNA samples at the time of trial.

After Bieber testified, defendant waived his right to either present evidence or to obtain his own expert. After the parties presented their arguments to the court about the validity of the statistical evidence, the trial court denied defendant's motion to suppress, ruling that the prosecution's evidence at the hearing supported the admission of the statistics and was adequate to meet the *Davis-Frye* test[2] and the requirements of this Court's prior opinion. The trial court concluded that the admissibility of DNA evidence and statistical evidence concerning DNA has been established throughout Michigan and the courts in this country.

We agree with the trial court's decision that the evidence at issue was admissible. MRE 702 governs the admissibility of expert testimony and provides:

> If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

---

[2] *People v Davis*, 343 Mich 348; 72 NW2d 269 (1955), and *Frye v United States*, 54 App DC 46, 47; 293 F 1013 (1923). The *Davis-Frye* test requires novel scientific methods be shown to have gained general acceptance in the scientific community to which it belongs before being admitted as evidence at trial.

To be admissible, expert testimony must comply with a three-part test. *In re Wentworth,* 251 Mich App 560, 563; 651 NW2d 773 (2002).

> First, the expert must be qualified. Second, the evidence must provide the trier of fact a better understanding of the evidence or assist in determining a fact in issue. Finally, the evidence must be from a recognized discipline. [*Id.* (citation omitted).]

The *Davis-Frye* test[3] is utilized to determine if novel scientific evidence has gained general acceptance among scientific experts in the field. *People v Holtzer,* 255 Mich App 478, 484; 660 NW2d 405 (2003). "The party offering the evidence carries the burden of demonstrating its acceptance in the scientific community." *People v Adams,* 195 Mich App 267, 269; 489 NW2d 192; (1992), mod on other grounds 441 Mich 916 (1993). When demonstrating that there is general scientific recognition of novel scientific techniques or principles, it is necessary to present the testimony of disinterested and impartial experts whose livelihood is not intimately connected with the technique at issue. *People v Haywood,* 209 Mich App 217, 221; 530 NW2d 497 (1995). The *Davis-Frye* test, however, is applied only to novel scientific techniques or principles. *Id.*

In this case, the trial court correctly determined that there were no novel scientific techniques or prin-

---

[3] In *Daubert v Merrell Dow Pharmaceuticals, Inc,* 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), the United States Supreme Court held that the *Frye* test was superseded by the adoption of FRE 702. See *People v Haywood,* 209 Mich App 217, 221 n 1; 530 NW2d 497 (1995). This Court is bound to continue utilizing the *Davis-Frye* test until the Michigan Supreme Court indicates a contrary position. *People v Lee,* 212 Mich App 228, 262 n 17; 537 NW2d 233 (1995).

ciples at issue such that a *Davis-Frye* analysis was necessary. Our courts firmly accept polymerase chain reaction (PCR) testing of evidence to obtain DNA profiles. *Coy, supra* at 292. In addition, the premise of this Court's prior opinion is that statistics are an integral part of DNA evidence and are necessary to assist the trier of fact. *Id.* at 297-302. Statistical evidence of DNA is generally admissible, in spite of the recognition that "there can be serious problems with making these [statistical] predictions because of a variety of factors, including insufficient data used for the purpose of comparison." *Herndon, supra* at 406, citing *Adams, supra* at 277-278. In *People v Chandler*, 211 Mich App 604, 611; 536 NW2d 799 (1995), this Court stated:

> Defendant also argues that DNA statistical analysis evidence must survive scrutiny under the *Davis/Frye* test. Defendant contends that [*People v*] *Adams* [195 Mich App 267; 489 NW2d 192 (1992)] did not subject the statistical analysis portion of the testing to *Davis/Frye* and thus it was erroneously decided. Similarly, the trial court in the present case did not apply a *Davis/Frye* test. As noted, every jurisdiction that has considered this question . . . has concluded that DNA statistical evidence satisfies the *Frye* test. Although defendant correctly notes that *Adams* did not specifically subject the challenged evidence to a *Davis/Frye* test, we conclude that such an examination was unnecessary. *Adams* held that challenges to the statistical evidence [are] relevant to its weight, not its admissibility, *supra* at 279.

This Court has continued to reject *Davis-Frye* challenges to statistical analysis of DNA evidence, finding such arguments are relevant to the weight of the evidence, not its admissibility. In our most recent DNA case, we reiterated that principle. *Holtzer, supra* at

491. See also *People v Leonard,* 224 Mich App 569, 591; 569 NW2d 663 (1997).

Next, defendant argues that the admission under MRE 803(3) of a statement made by the victim denied him a fair trial. We disagree. Although defendant objected that the testimony was hearsay, that objection did not preserve the issue whether the testimony violated the Confrontation Clauses of the federal and state constitutions, US Const Am VI; Const 1963, art 1 § 20. MRE 103(a)(1); *People v Aldrich,* 246 Mich App 101, 113; 631 NW2d 67 (2001). A trial court's decision to admit evidence is reviewed for a clear abuse of discretion. *Id.* Evidentiary error will not merit reversal unless it involves a substantial right and, after an examination of the entire cause, it affirmatively appears that it is more probable than not that the error was outcome determinative. *People v Lukity,* 460 Mich 484, 495-496; 596 NW2d 607 (1999).

We review unpreserved evidentiary error, including alleged constitutional error, for plain error. *People v Carines,* 460 Mich 750, 763, 774; 597 NW2d 130; *Coy, supra* at 287. First, there must be an error; second, the error must be plain (i.e., clear or obvious); and third, the error must affect substantial rights (i.e., there must be a showing that the error was outcome determinative). *Carines, supra* at 763. Moreover, reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of guilt or innocence. *Id.; Coy, supra* at 312-313.

In this case, during the cross-examination of Officer Lee Graham, defense counsel asked whether McKee had told Graham that she was supposed to

page defendant for the victim on the night of her death. Graham answered that McKee had. Later, when McKee testified and the prosecutor asked her what discussion she had had with the victim, defense counsel objected to the testimony on the basis that it was hearsay. The prosecutor argued that the statement fell within MRE 803(3). The trial court agreed and admitted the testimony as evidence of the victim's intention or plan. McKee testified that the victim told her she planned to meet defendant on the night of the homicide and asked McKee to page defendant to remind him.

The trial court did not clearly abuse its discretion by admitting the hearsay statement in question. *Aldrich, supra* at 113. "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id.*, citing *People v Sabin (After Remand)*, 463 Mich 43, 67; 614 NW2d 888 (2000). Generally, all relevant evidence is admissible, and irrelevant evidence is not. MRE 402; *People v Starr*, 457 Mich 490, 497; 577 NW2d 673 (1998). To be relevant, evidence must have "any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." MRE 401; *Sabin, supra* at 57. In the present case, the trial court found that the evidence was relevant to the victim's intention or plan to meet defendant at her apartment on the night of her murder. MRE 803(3). Because no evidence of forced entry existed, one could rationally infer that the victim admitted her killer into the apartment. Evidence that the victim had a relationship with defendant and that she expected him on the night in question made it more probable that the victim admitted defendant into her apartment on the

night of her death. Moreover, the evidence rebutted defendant's statement to the police and his testimony at trial that he did not stop at the victim's apartment on the evening of her murder because the lights in the apartment were off. Defendant claimed that he never went to the victim's apartment when the lights were off. It is rational to infer that the victim would not turn off the lights in her apartment if she were planning to meet with defendant.

MRE 803(3) provides that "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed" is not excluded by the hearsay rule. Here, the victim's statement of future intent or plan to meet with defendant on the night of her murder falls within the plain meaning of the rule. In *People v Fisher*, 449 Mich 441, 450; 537 NW2d 577 (1995), our Supreme Court admitted evidence of several statements made by a murder victim. Although the victim's state of mind was not "at issue," the Court admitted the victim's statements because they demonstrated marital discord, motive, and premeditation. *Id.* at 447-450. Most of the statements in *Fisher* were admissible to show the effect they had on the defendant and thus were relevant to the defendant's motive and premeditation. *Id.* The Court, however, also sanctioned the admission of statements of which the defendant was unaware:

> The victim-wife's statements that were not known to the defendant about her plans to visit Germany to be with her lover and her plans to divorce the defendant upon her return are hearsay. They are admissible, however, because

they satisfy the exception to the hearsay rule for "statement[s] of the declarant's then existing . . . intent, plan . . . [or] mental feeling . . . ." MRE 803(3). [*Id.* at 450.]

In *People v Ortiz*, 249 Mich App 297; 642 NW2d 417 (2001), the prosecutor sought to introduce several of the victim's statements, including that the defendant had threatened, stalked, and assaulted her and that she was afraid of the defendant and planned to change her will and enforce a child support order. Relying on *Fisher, supra,* and *People v King*, 215 Mich App 301; 544 NW2d 765 (1996), this Court ruled that the trial court's admission of the victim's statements was not an abuse of discretion:

Evidence of the victim's state of mind, evidence of the victim's plans, which demonstrated motive (the ending of the marriage and the tension between the victim and defendant), and evidence of statements that defendant made to cause the victim fear were admissible under MRE 803(3). They were relevant to numerous issues in the case, including the issue of motive, deliberation, and premeditation and the issue whether the victim would have engaged in consensual sexual relations with defendant the week before her death. [*Ortiz, supra* at 310.]

Similarly, in *King, supra* at 309, the trial court did not abuse its discretion by admitting the victim's hearsay statements concerning her fear and which "explained why [the victim] adopted certain precautions when she arrived at her house," and "would not have gotten out of her car when she arrived at home without waiting for defendant." The *King* Court specifically rejected the defendant's argument, which was based on *People v White*, 401 Mich 482; 257 NW2d 912 (1977), that the victim's state of mind must be "at issue" because our Supreme Court in *Fisher, supra,*

did not take that approach. *King, supra* at 309. See also *People v Riggs*, 223 Mich App 662, 704-705; 568 NW2d 101 (1997) (Smolenski, J.) (a murder victim's letters stating that he would not tolerate wrongdoing in his marriage were properly admitted under MRE 803[3]).

Because the trial court did not abuse its discretion by admitting the hearsay evidence at issue under MRE 803(3), defendant's unpreserved claim that his Confrontation Clause rights were violated is without merit. In *Ohio v Roberts*, 448 US 56, 66; 100 S Ct 2531; 65 L Ed 2d 597 (1980), the United States Supreme Court noted that the " 'hearsay rules and the Confrontation Clause are generally designed to protect similar values,' " quoting *California v Green*, 399 US 149, 155; 90 S Ct 1930; 26 L Ed 2d 489 (1970), and " 'stem from the same roots,' " quoting *Dutton v Evans*, 400 US 74, 86; 91 S Ct 210; 27 L Ed 2d 213 (1970). Thus, the Supreme Court concluded that adequate "indicia of reliability" to satisfy the Confrontation Clause "can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Id.* at 66. In the present case, MRE 803(3) is a "firmly rooted" hearsay exception; therefore, statements that satisfy the rule carry sufficient indicia of reliability to satisfy the Confrontation Clause "without more." *Id.*; *Ortiz, supra* at 310-311. Plain error affecting defendant's substantial rights did not occur. *Carines, supra* at 763, 774; *Ortiz, supra* at 310.

Next, defendant argues that error warranting reversal occurred when the trial court denied his motion for a continuance to locate a witness, Pam Perry, who allegedly could offer testimony to impeach the testimony of McKee's son, Jordan. In related arguments,

defendant contends the trial court erred by failing to grant his motion to suppress Jordan's testimony or grant a mistrial because Perry could not be located. We disagree. We review the trial court's ruling on defendant's request for an adjournment or a continuance for an abuse of discretion. *People v Snider*, 239 Mich App 393, 421; 608 NW2d 502 (2000). We also review the trial court's decision on a motion for mistrial for an abuse of discretion. *People v Dennis*, 464 Mich 567, 572; 628 NW2d 502 (2001).

Jordan did not testify at defendant's first trial because he was only four years old. McKee found Jordan hiding under the covers of her bed the night she found the victim's body. At the time of the retrial in this case, Jordan was seven years old and he testified at that trial. He recalled that he usually went to bed at 8:00 P.M. On the night of the homicide, he heard a knock on the door right after he went to bed. He did not hear any arguing. Later, the victim and her visitor went into the victim's bedroom. Jordan testified that he heard the victim scream and saw defendant's coat, which was black and had a big circle on the back. Jordan saw defendant wearing the same coat earlier that day, at which time he said he would return later. That night, Jordan saw defendant wearing the coat and leaving the victim's room. He did not see defendant's face. Jordan ran into McKee's room and hid under the bed covers. Defendant did not see him. Later, when Jordan went to the bathroom, he saw the victim on the floor in her room. Jordan denied telling Melissa Lewis, defendant's girlfriend, that he did not know who killed the victim or that McKee or her brother, Darnell Riddle, told him that defendant was the killer.

The police never interviewed Perry. Defense counsel indicated that Perry formerly resided at 66 South Burge and that his private investigator interviewed her before the first trial in 1998. Outside the presence of the jury, defendant's private investigator testified that when he interviewed Perry in 1998, she stated that after the homicide Jordan was asked who could have done it, and he responded "my daddy."

Defendant's argument that the trial court abused its discretion in denying an adjournment to look for Perry is meritless. A motion for adjournment must be based on good cause. *People v Jackson*, 467 Mich 272, 276; 650 NW2d 665 (2002). Moreover, MCR 2.503(C) provides:

> (1) A motion to adjourn a proceeding because of the unavailability of a witness or evidence must be made as soon as possible after ascertaining the facts.
>
> (2) An adjournment may be granted on the ground of unavailability of a witness or evidence only if the court finds that the evidence is material and that diligent efforts have been made to produce the witness or evidence.

Thus, to invoke the trial court's discretion to grant a continuance or adjournment, a defendant must show both good cause and diligence. *People v Taylor*, 159 Mich App 468, 489; 406 NW2d 859 (1987). "Good cause" factors include "whether defendant (1) asserted a constitutional right, (2) had a legitimate reason for asserting the right, (3) had been negligent, and (4) had requested previous adjournments." *People v Lawton*, 196 Mich App 341, 348; 492 NW2d 810 (1992). Even with good cause and due diligence, the trial court's denial of a request for an adjournment or continuance is not grounds for reversal unless the

defendant demonstrates prejudice as a result of the abuse of discretion. *Snider, supra* at 421-422.

The trial court did not abuse its discretion when it denied defendant's motion to adjourn. Defendant did not use due diligence to locate Perry. On July 13, 2001, the prosecutor gave notice that he intended to call Jordan as a witness at the retrial. On August 7, 2001, the day scheduled for trial, defendant moved for an adjournment. There was no evidence that he made any effort, much less a diligent one, to locate Perry before requesting the adjournment. MCR 2.503(C). The record indicates that in the weeks leading up to trial, Perry's address was produced within minutes of the defense's request that the prosecutor check Perry's name on the Law Enforcement Information Network (LEIN) system. Perry was evicted on the very day that defendant requested his adjournment. Had defendant exerted even minimal efforts to locate Perry before trial, he might have found her. Moreover, defendant cannot demonstrate prejudice. Even if Perry had been located, no foundation existed for admitting her impeachment testimony. Defendant failed to confront Jordan with his alleged prior statement to Perry. MRE 613(b). Further, there is nothing in the record to confirm that Perry would have testified in accord with defendant's investigator's report.

Although defendant also argues that the trial court abused its discretion by not granting a mistrial or suppressing Jordan's testimony, neither issue is properly before this Court. Defendant has not briefed these issues or offered any supporting authority. Where a defendant raises an issue in his statement of questions presented but fails to argue the merits in his

brief, the issue is abandoned. *People v Anderson*, 209 Mich App 527, 538; 531 NW2d 780 (1995).

Next, defendant argues that the trial court abused its discretion by not granting an adjournment to allow time to complete DNA testing on Riddle's blood. We disagree. Although the prosecutor did not consider Riddle a suspect because he had a confirmed alibi, Riddle's blood was drawn for DNA testing a week before trial in response to defendant's insinuations that Riddle should be a suspect. DNA testing was not completed before the trial. On the first day of trial, defendant moved for an adjournment arguing, in part, that the results of DNA testing on Riddle were crucial to his case. Defense counsel acknowledged he had not sought an order from the trial court to require such testing and could cite no authority to support a request. In fact, defense counsel admitted that he had never properly requested DNA testing on Riddle's blood and also acknowledged that Riddle was located only a week before trial because he had absconded while on parole. The trial court denied the request for an adjournment, reasoning:

> Well, I'm not satisfied of any proper basis to adjourn the case based on the entire record made here with respect to the issues concerning the DNA. I note . . . that the tests . . . being discussed here are not tests concerning the Defendant directly, or the victim directly, but refer sort of tangentially to tests initiated by the Prosecution to rebut potential Defense arguments in this case about alternative suspects . . . .

> *        *        *

> I'm not satisfied that there is a sufficient likelihood of the discovery of relevant—of evidence relevant to the Defense by the further or continued analysis of either the DNA of

Holiday[4] or Riddle, based on the record made before me today; [and] will not order the adjournment of this case for further examination; and will deny any Defense motion that mandates or directs the performance of tests with respect to those two individuals.

Absent a showing of suppression of evidence, intentional misconduct, or bad faith, the prosecutor and the police are not required to test evidence to accord a defendant due process. *Arizona v Young-blood*, 488 US 51, 58; 109 S Ct 333; 102 L Ed 2d 281 (1988); *People v Marks*, 155 Mich App 203, 219; 399 NW2d 469 (1986). Nor does due process require that the prosecution seek and find exculpatory evidence. *People v Miller (After Remand)*, 211 Mich App 30, 43; 535 NW2d 518 (1995). Although the prosecution bears the burden of proving guilt beyond a reasonable doubt in a criminal trial, it need not negate every theory consistent with defendant's innocence, *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000), nor exhaust all scientific means at its disposal, *People v Allen*, 351 Mich 535, 548-549; 88 NW2d 433 (1958). As our Supreme Court noted, neither the prosecution nor the defense has an affirmative duty to search for evidence to aid in the other's case. *People v Burwick*, 450 Mich 281, 289 n 10; 537 NW2d 813 (1995). In sum, defendant cites no authority, and we are aware of none, that would have required the prosecutor, on the basis of the facts in this case, to complete DNA testing of Riddle's blood. See, e.g., *People v Vaughn*, 200 Mich App 611, 619; 505 NW2d 41 (1993), rev'd on other

---

[4] Later in the trial, the parties stipulated that DNA testing had excluded D.C. Holiday, another possible suspect, as a potential contributor to the DNA found in the evidentiary samples from the knife blade and the victim's bedroom doorknob.

grounds 447 Mich 217 (1994), where this Court noted a clear distinction between the failure to disclose evidence and the failure to develop evidence. As this Court explained in *People v Stephens*, 58 Mich App 701, 705; 228 NW2d 527 (1975):

> The crucial distinction is between failing to disclose evidence that has been developed and failing to develop evidence in the first instance. When the police fail to run any tests, the lack of evidence will tend to injure their case more than defendant's since the prosecution has the burden of proving guilt beyond a reasonable doubt.

An adjournment is only allowed upon a showing of good cause and diligence. *Taylor, supra* at 489. Defendant demonstrated neither: he was dilatory, and his exculpatory theory was highly speculative. Although a slight chance exists that DNA testing may not have excluded Riddle as a possible contributor to the mixed DNA samples taken from the knife blade and the doorknob, Riddle had a corroborated alibi. Nothing in the record suggests that DNA testing would have assisted defendant's case. Moreover, defendant was entirely negligent with respect to his requests. This Court decided *Coy, supra*, in November 2000. Because defendant did not show the good cause or diligence necessary for an adjournment, the trial court did not abuse its discretion by denying defendant's motion to adjourn to accommodate his last-minute request to have Riddle's DNA tested.

Finally, defendant argues that he is entitled to resentencing. We disagree. Our review is limited to determining whether the sentencing court abused its discretion by imposing a sentence disproportionate to the seriousness of the circumstances surrounding the offense and the offender. *People v Milbourn*, 435 Mich

630, 635-636, 654; 461 NW2d 1 (1990); *People v Craw-ford*, 232 Mich App 608, 621; 591 NW2d 669 (1998).

Because the homicide at issue occurred in January 1998, the legislative sentencing guidelines do not apply. MCL 769.34(1),(2); *People v Babcock*, 244 Mich App 64, 72; 624 NW2d 469 (2000). Although the minimum sentence range calculated under the judicial sentencing guidelines was four to ten years, those guidelines also do not apply because defendant was an habitual offender. *People v Colon*, 250 Mich App 59, 65; 644 NW2d 790 (2002). Nevertheless, the principle of proportionality applies. *People v McFall*, 224 Mich App 403, 415; 569 NW2d 828 (1997).

The sentence is proportionate to the offense and the offender. Defendant had a criminal history that included three misdemeanors, one for assault and battery, one for hindering or opposing a police officer, and one for driving with a suspended license. He had two felony convictions for carrying a concealed weapon. In addition, the presentence investigation report noted that, by defendant's own admission, he had a bad temper. He also had a history of substance abuse, including marijuana use.

The crime at issue was brutal. The victim sustained between twenty and twenty-five stab wounds. She sustained defensive wounds on her wrists, and her eyes were blackened. The pathologist who performed the autopsy testified that the majority of the wounds were made while the victim was active and moving. However, according to the pathologist, when the fatal wounds to her right side were inflicted, the victim was lying still on the floor with her back exposed. The victim's five-year-old son and two other small boys were in the house at the time of the crime.

Under the circumstances, defendant's sentence is proportionate to the seriousness of the offense and the defendant's prior record. Where, as here, an habitual offender's underlying felony and criminal history demonstrate that he is unable to conform his conduct to the law, a sentence within the statutory limits is proportionate. *People v Hansford (After Remand)*, 454 Mich 320, 326; 562 NW2d 460 (1997); *Colon, supra* at 65.

We affirm defendant's conviction and sentence.