# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAVID DEQUAN SIMS,

        Defendant-Appellant.

UNPUBLISHED
December 4, 2014

No. 316922
Wayne Circuit Court
LC No. 12-005267-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEANGELO AL JENKINS,

        Defendant-Appellant.

No. 317065
Wayne Circuit Court
LC No. 12-011864-FC

---

Before: BORRELLO, P.J., and WILDER and STEPHENS, JJ.

PER CURIAM.

In these consolidated appeals, defendant, David Dequan Sims, appeals as of right from his jury trial convictions of assault with intent to rob while armed, MCL 750.89, and assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84. Sims was sentenced on June 18, 2013, to 18 years and nine months to 30 years' imprisonment for the assault with intent to rob while armed conviction and to five years to 10 years' imprisonment for the AWIGBH conviction. Sims was convicted on October 11, 2012, in a prior trial involving the same events as his current convictions, of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and sentenced to two years' imprisonment. Defendant, Deangelo Al Jenkins, appeals as of right from his jury trial convictions, under an aiding and abetting theory, of assault with intent to rob while armed, MCL 750.89, AWIGBH, MCL 750.84, and felony-firearm, MCL 750.227b. Jenkins was sentenced as a second habitual offender, MCL 769.10, to 135 months to 25 years' imprisonment for the assault with intent to rob while armed conviction, five years to 10 years' imprisonment for the AWIGBH conviction, and two years'

-1-

imprisonment for the felony-firearm conviction. For the reasons set forth in this opinion, we affirm the convictions and sentences of defendants.

## I. BACKGROUND

This appeal arises from events that occurred on April 10, 2012 in Detroit, Michigan, involving an armed assault of Keith Hamilton by three individuals: (a) David Sims (Sims), (b) Darius Sims (Darius), and (c) Deangelo Jenkins (Jenkins). On that date, Hamilton, a retired Detroit police officer accompanied by his brother, James Hamilton, pulled his vehicle into the driveway of his brother's home. After parking in the driveway, Hamilton exited the vehicle and began to walk between his brother's house and a neighbor's house. He then observed a "red vehicle with a cream or a white colored simulated drop top . . . abruptly hit [sic] brakes behind my car." The vehicle then parked in front of the neighbor's house, the two rear doors of the vehicle opened and two individuals exited the vehicle wearing hoodies and ski masks and carrying "semi-automatic weapons with large clips in them." The individuals "rushed" toward Hamilton's car and the individual at the driver's side of his vehicle raised his weapon, while the second individual was at the rear passenger side of Hamilton's vehicle. The individual at his driver's side rear passenger door pointed his weapon at Hamilton and fired one round. Hamilton pulled his own weapon and also fired several times. One of Hamilton's shots struck one gunman and he fell behind Hamilton's vehicle. Hamilton was approximately 35 to 40 feet from the first gunman when the first gunman fell to the ground. The second gunman began to back away toward the vehicle parked on the street. Hamilton's brother was still in his vehicle on the passenger side. Hamilton was aiming at the second gunman when his brother exited Hamilton's vehicle. Hamilton instructed his brother to "get down." When Hamilton's brother dropped to the ground, "the second subject that was in the street fired two shots up in the driveway." While Hamilton was aiming at the second gunman, the gunman that had been shot "was laying [sic] on the ground sat up and fired another shot at me up the driveway." The gunman that had been shot removed his facemask and threw it and "the gun approximately four or five feet away from him." At this point, the second gunman entered the back seat of the red vehicle and the first gunman, while on the ground, began yelling to his cohorts not to leave him and that he has been wounded. The rear passenger door of the red vehicle opened and the injured gunman "hobbles over [to the vehicle and] gets his upper torso in the car and they speed off. . . ." Hamilton phoned the police and provided a description of the vehicle.

Todd Hutchison, a Detroit Police Officer, was on routine patrol between 2:30 a.m. and 3:00 a.m. on April 10, 2012. While in the area of Fenkell and Wyoming Streets in Detroit, Hutchison was "flagged down" by "two black males in a red vehicle." Hutchison stopped his vehicle and spoke with the driver who informed him that "his friend in the back seat of his car was shot." In total, Hutchison testified that there were three males in the vehicle. Hutchison had the driver of the red car follow him to Sinai Grace Hospital, the nearest medical facility. The driver informed Hutchison that his name was Cortez Robinson, however, Hutchison later found the driver's identification in the vehicle on the driver's seat. The name on the identification was Deangelo Jenkins. The photograph on the identification matched Hutchison's observation of the driver of the vehicle. Hutchison escorted the driver into the hospital while medical staff attended to the backseat passenger. At trial, Hutchison identified Sims as the individual shot and in the backseat of the vehicle and Jenkins as the driver. Hutchison had the red Buick impounded.

Jennifer Duchene, is employed with Legend Motors. She provided a rental car to a customer named Shamia Wilson, while Wilson's personal vehicle was in for repairs on April 9, 2012. The rental car provided was the same red, four-door 2003 Buick LeSabre Limited, that was later retrieved from Gene's Towing impound yard. Shamia Wilson was Jenkins's girlfriend until July of 2012. On April 9, 2012, Wilson was driving a red LeSabre while her vehicle was being repaired. On that date, she switched vehicles with Jenkins giving him her rental car. Some of Wilson's friends confirmed this at trial, and further testified Jenkins was accompanied by David and Darius Sims. In the early morning hours of April 10, 2012, Wilson received a telephone call from Jenkins asking her to meet him at Sinai Grace Hospital. She acknowledged that her first statement to the police following the incident was not truthful because she was trying to protect Jenkins. However, she testified that after speaking with her family, Wilson provided a truthful statement to the police on April 27, 2012. At the time of her second statement, Wilson described her relationship with Jenkins as being "on and off."

At the conclusion of testimony, the prosecutor brought a motion to reopen the proofs to enter a certified copy of the medical records for David Sims. When queried by the trial court, the prosecutor indicated that the purpose of the medical records was to confirm testimony of the various witnesses presented at trial.

The trial court granted the prosecutor's motion to reopen the proofs finding no "surprise, deception, or disadvantage" to the defense. The trial court determined that any comments within the medical records indicating that the statement originated from a police officer rather than from David Sims to the physician or staff "should be stricken." Defense counsel indicated she would not stipulate to admission of the records, however, all parties concurred that the medical records being offered into evidence were certified. The trial court admitted the records into evidence based on their certification and "on the rules of evidence" but cautioned that any reference to statements by police officers to hospital staff should be redacted.

The jury convicted defendants as indicated above. The trial court sentenced each defendant as previously indicated and this appeal then ensued.

## II. DOCKET NO. 316922

In Docket No. 316922, Sims asserts he was denied a fair trial by the trial court's erroneous admission of his medical records into evidence. Specifically, Sims contends error in the admission of his medical records from the night of the incident, asserting that the records (a) comprised hearsay, (b) violated the Confrontation Clause and (c) were not relevant to an issue at trial based on Sims's admission that he had incurred a gunshot wound.

To preserve an evidentiary issue for appellate review, the party opposing admission of the evidence is required to object at trial and to specify the same ground for objection that he or she asserts on appeal. MRE 103(a)(1); *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). An objection premised on hearsay fails to preserve for appellate review a challenge that the evidence violated the Confrontation Clause. MRE 103(a)(1); *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003). To the extent that defendant objected to admission of the evidence based on relevance, the issue is preserved. The remaining objections by defendant are not properly preserved for appeal because they were not asserted in the trial court.

As discussed in *Coy*, 258 Mich App at 12:

> A trial court's decision to admit evidence is reviewed for a clear abuse of discretion. Evidentiary error will not merit reversal unless it involves a substantial right and, after an examination of the entire cause, it affirmatively appears that it is more probable than not that the error was outcome determinative.

"An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

Unpreserved issues of evidentiary error, including alleged constitutional error, are reviewed for plain error. *Coy*, 258 Mich App at 12. Specifically:

> First, there must be an error; second, the error must be plain (i.e., clear or obvious); and third, the error must affect substantial rights (i.e., there must be a showing that the error was outcome determinative). Moreover, reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of guilt or innocence. [*Id.* (citations omitted).]

MRE 803(6) accepts from the exclusionary hearsay rule a record or report "made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity." To demonstrate that the report was made as a regular practice of the business, the proponent is required to present "testimony of the custodian or other qualified witness" or certify the record. *Id.* To certify a record of a regularly conducted business activity, the proponent must submit an affidavit from the custodian of the record containing the information delineated in MRE 902(11). Because the parties stipulated at trial that the records were properly certified, the admission of the records into evidence did not pose a hearsay problem under MRE 803(6). Further, any statements by Sims contained within the records did not violate a hearsay prohibition as such statements were necessary for him to seek and obtain medical treatment and fell within the exception of MRE 803(4).

"[T]he rules of evidence cannot[, however,] override the Sixth Amendment and cannot be used to admit evidence that would otherwise implicate the Sixth Amendment." *People v Fackelman*, 489 Mich 515, 545; 802 NW2d 552 (2011). See also *Crawford v Washington*, 541 US 36, 54; 124 S Ct 1354; 158 L Ed 2d 177 (2004) ("The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts.") It has been determined that when the content of the record is used to prove the truth of the matter asserted, the admission of a testimonial medical record or a medical record containing testimonial statements can violate a defendant's confrontation right despite the hearsay exception. *Fackelman*, 489 Mich at 550. However, in the circumstances of this case, the challenged record was created by medical staff attending to Sims on an emergency basis in an attempt to assess and treat his gunshot wound and not to establish the fact that Sims was shot by Keith Hamilton in an attempt to rob Hamilton or carjack his vehicle. To accomplish their treatment objective, it was necessary for the medical staff to garner information pertaining to how and when Sims's injury occurred. In *People v Jordan*, 275 Mich App 659, 664-665; 739

-4-

NW2d 706 (2007), this Court held, "Because all statements by the victim were necessary to resolving the ongoing emergency, the statements were nontestimonial." Sims has failed to argue or demonstrate that the content of the medical records was anything other than recorded observations of the hospital staff and notes made to assist in the treatment and provision of care to Sims. As discussed in *Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006):

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

There is no dispute that Sims's medical records were the product of the hospital staff's attempt to meet an ongoing emergency – Sims's gunshot wound and bleeding. As such, the observations were not testimonial in nature and did not violate the prohibitions of the Confrontation Clause.

Sims further argues that the records were not relevant because he did not dispute having incurred a gunshot wound on that night. "Relevant evidence" is defined by MRE 401 to "mean[] evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In general "[a]ll relevant evidence is admissible," MRE 402, but "may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," MRE 403. The medical records served to corroborate the existence of Sims's gunshot wound and were, therefore, relevant. The documentation also corroborated, in conjunction with the DNA obtained from the ski mask, the weapon retrieved from the crime scene and descriptions and testimony of the vehicle involved in the crime, Hamilton's testimony. Notably, MRE 403 does not preclude the presentation of cumulative evidence, only the "*needless presentation of cumulative evidence*." (Emphasis added.) There is no indication in the trial transcripts that any inordinate amount of time was spent on the content of the records or that undue emphasis was placed on any particular entry contained within the records. At worst, Sims's medical records provided cumulative evidence of his gunshot wound and comprised harmless error. See *People v Matuszak*, 263 Mich App 42, 52; 687 NW2d 342 (2004).

Sims further asserts that the admission of his medical records was improper as the records were more prejudicial than probative. "[A]ll evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is substantially outweighed by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995). For evidence to be construed as unfairly prejudicial under MRE 403, it must "adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v Fisher*, 449 Mich 441, 452; 537 NW2d 577 (1995) (quotation omitted). During closing arguments, Sims's counsel acknowledged that his client incurred a gunshot wound on the

evening of these events, merely disputing the location where and the circumstances under which the wound was obtained. Based on this admission, it is difficult to construe the medical records as unduly prejudicial given their mere corroboration of Sims's own admission of having incurred a gunshot wound. Further, given the physical and testimonial evidence of Sims's guilt, it is highly improbable that the admission of his medical records, even if wrongly admitted, comprised outcome determinative error. See *People v Lukity*, 460 Mich 484, 496-497; 596 NW2d 607 (1999).

Next, Sims contends his conviction for AWIGBH should be vacated due to the lack of evidence to show the requisite intent for the crime. Specifically, Sims argues that while it may have been demonstrated that he had the requisite intent for the charged crime of assault with intent to rob while armed, there was no evidence to show that he possessed the intent to do physical harm to Hamilton or his brother.

This Court reviews a challenge to the sufficiency of the evidence de novo. *People v Malone*, 287 Mich App 648, 654; 792 NW2d 7 (2010). This Court is required to view the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013). "[C]onflicts in the evidence are resolved in favor of the prosecution. Circumstantial evidence and reasonable inferences arising [from the evidence] may constitute proof of the elements of the crime." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). An appellate court will not interfere with a jury's assessment of the weight of the evidence or the credibility of witnesses. *Dunigan*, 299 Mich App at 582. The Court's review is to be deferential because the trier of fact, and not the appellate court, properly determines what inferences can be fairly drawn from the evidence and the weight to be accorded those inferences. *Malone*, 287 Mich App at 654.

"The elements of assault with intent to do great bodily harm less than murder are: (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005) (quotation marks and citation omitted); see MCL 750.84(1)(a). Intent to do great bodily harm has been defined as "an intent to do serious injury of an aggravated nature." *Brown*, 267 Mich App at 147 (quotation marks and citation omitted). No actual physical injury is required to establish the elements of AWIGBH. See *People v Harrington*, 194 Mich App 424, 430; 487 NW2d 479 (1992).

"An actor's intent may be inferred from all of the facts and circumstances, and because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v Gonzalez*, 256 Mich App 212, 226; 663 NW2d 499 (2003) (citations and quotations omitted); see also *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). A defendant's intent may also be inferred from the type of weapon used. *People v Daniels*, 163 Mich App 703, 706-707; 415 NW2d 282 (1987). The evidence showed that Hamilton and his brother were suddenly approached at night, in the driveway of the brother's home, by two heavily armed and masked gunmen. The gunmen "rushed" toward Hamilton's car. Based on the injury incurred at the scene, Sims was the gunman at the driver's side of Hamilton's vehicle who raised his weapon, pointed it at Hamilton and fired. Hamilton was only 35 to 40 feet from Sims when Sims discharged his weapon. The second gunman also aimed his weapon and fired two

shots "up in the driveway" after Jack Hamilton had exited the vehicle. After being shot by Hamilton, Sims rose to a sitting position and again discharged his weapon at Hamilton "up the driveway."

A defendant's intent may be inferred from his or her conduct and the circumstances surrounding the offense. *People v Johnson*, 54 Mich App 303, 304; 220 NW2d 705 (1974). The gunmen had semi-automatic weapons with large clips of ammunition. Both gunmen aimed and discharged their weapons in relatively close physical proximity to Hamilton and his brother. One of the gunmen's errant shots struck the residence of Jack Hamilton's neighbor. Viewing the evidence, direct and circumstantial, in a light most favorable to the prosecution, the essential elements of the crime were established beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012). Therefore, based on the conduct of Sims and the second gunman and the type of weapon used, sufficient evidence was adduced to satisfy the intent element for AWIGBH.

### III. DOCKET NO. 317065

In Docket No. 317065, Jenkins contends that insufficient evidence was presented to sustain his convictions under an aiding and abetting theory based on the inability to demonstrate he knew his co-defendants had the requisite intent to commit the crimes charged at the time he drove the vehicle to the residence and parked by Hamilton's vehicle.

"The elements of assault with intent to do great bodily harm less than murder are: (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *Brown*, 267 Mich App at 147 (quotation marks and citation omitted); see MCL 750.84(1)(a). "The elements of assault with intent to rob while armed are: (1) an assault with force and violence; (2) an intent to rob or steal; and (3) the defendant's being armed. Because this is a specific-intent crime, there must be evidence that the defendant intended to rob or steal." *People v Cotton*, 191 Mich App 377, 391; 478 NW2d 681 (1991) (citation omitted).

A defendant may be vicariously liable for assault with intent to do great bodily harm less than murder or assault with intent to rob on a theory of aiding and abetting. *People v Usher*, 196 Mich App 228, 232-233; 492 NW2d 786 (1992), overruled in part on other grounds by *People v Perry*, 460 Mich 55, 64-65; 594 NW2d 477 (1999). The elements of aiding and abetting include:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (quotation marks and citations omitted).]

See also MCL 767.39.

Sufficient evidence existed to sustain Jenkins's convictions of AWIGBH and assault with intent to rob while armed under an aiding and abetting theory. Jenkins's girlfriend, Shamia Wilkins, traded vehicles with Jenkins the evening before the events underlying the charges. Her

vehicle matched the description of the car observed by Hamilton at the scene and was later impounded by police. Wilson and her girlfriend, Brittany Scott, both testified that Sims and his brother Darius Sims were with Jenkins when the vehicles were exchanged. Jenkins told Wilson, "[h]e tried to carjack somebody and it went wrong." Hamilton shot one of the gunmen at the scene and Jenkins drove Sims to Sinai Grace Hospital with a bullet wound within close temporal proximity to the events underlying the charges.

At the scene of the events, Jenkins was driving Wilson's vehicle and stopped near the residence as Hamilton parked his car in the driveway. Two men masked and with semi-automatic weapons, exited the backseat of the vehicle driven by Jenkins and "rushed" up the driveway. The gunmen raised their weapons and discharged them in the direction of Hamilton. The second gunman entered the vehicle driven by Jenkins after Sims was shot and on the ground. Sims cried out to not be left behind by his cohorts. On arising, a back door to the vehicle driven by Jenkins was opened and did not leave the scene until after Sims was able to enter the car. Jenkins was driving the vehicle identified in conjunction with the events involving Hamilton after flagging down a police officer, Todd Hutchinson. Sims was in the backseat of the vehicle bleeding from a gunshot wound. Hutchinson accompanied Sims, Jenkins and a third individual to the hospital. Jenkins was identified by Hutchinson as the driver of the vehicle, despite Jenkins having given a false name to the police officer.

In accordance with MCL 767.39:

Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

"An aider and abettor's state of mind may be inferred from all the facts and circumstances." *People v Carines*, 460 Mich 750, 758; 597 NW2d 130 (1999). "Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Id*. In this instance, evidence existed that prior to the shooting, Jenkins switched his vehicle to one matching the description of the automobile at the scene of the crime. Jenkins is friends with Sims and was accompanied by Sims when procuring the alternative vehicle. Jenkins transported two armed and masked gunmen in the backseat of his vehicle and stopped in proximity of Hamilton's car after he pulled into his brother's driveway. Sims and a second gunman exited the vehicle and proceeded past the driver of their vehicle up the driveway with their guns displayed and fired shots in Hamilton's direction. Upon seeing this activity, Jenkins waited and did not leave the scene; even after Sims was shot, Jenkins waited and a door to the vehicle was opened to permit Sims to enter the vehicle before it left the area. At the hospital, Jenkins purposefully provided Hutchinson with a false name. These acts, considered in the aggregate, demonstrate both planning and participation. "To place the issue of aiding and abetting before the trier of fact, the evidence need only tend to establish that more than one person committed the crime, and that the role of a defendant charged as an aider and abettor amounts to something less than the direct commission of the offense." *People v Wilson*, 196 Mich App 604, 611; 493 NW2d 471 (1992) (citation omitted). Jenkins's presence during the commission of the criminal conduct in conjunction with the assistance he provided to Sims and the other gunman to commit the

crime by securing a vehicle, driving the vehicle and awaiting the completion of the criminal acts, is sufficient to constitute aiding and abetting and to sustain Jenkins's convictions for these crimes. *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004).

The elements of felony-firearm "are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony. One must carry or possess the firearm when committing or attempting to commit a felony. Possession of a firearm can be actual or constructive, joint or exclusive." *People v Johnson*, 293 Mich App 79, 82-83; 808 NW2d 815 (2011) (footnotes omitted). "The aiding and abetting statute neither expressly nor impliedly limits the persons or crimes encompassed by its terms. The language of the statute applies to 'every person' who commits 'an offense.'" *Moore*, 470 Mich at 68. "All that is required to prove aiding and abetting felony-firearm is that the defendant aided and abetted another in carrying or having in his possession a firearm while that other commits or attempts to commit a felony." *Id.* As explained by our Supreme Court:

The prosecutors must do more than demonstrate that defendants aided the commission or attempted commission of the underlying crimes. Rather, the prosecutors must demonstrate that defendants specifically aided the commission of felony-firearm. Establishing that a defendant has aided and abetted a felony-firearm offense requires proof that a violation of the felony-firearm statute was committed by the defendant or some other person, that the defendant performed acts or gave encouragement that assisted in the commission of the felony-firearm violation, and that the defendant intended the commission of the felony-firearm violation or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement. In determining whether a defendant assisted in the commission of the crime, the amount of advice, aid, or encouragement is not material if it had the effect of inducing the commission of the crime. It must be determined on a case-by-case basis whether the defendant "'performed acts or gave encouragement that assisted'" in the carrying or possession of a firearm during the commission of a felony. [*Id.* at 70-71 (citations and footnotes omitted).]

"Implicit in the *use* of a firearm is the *possession* of that firearm." *Moore*, 470 Mich at 71 (emphasis in original). "Thus, when a defendant specifically encourages another possessing a gun during the commission of a felony to use that gun, he aids and abets the carrying or possessing of that gun just as surely as if he aided or abetted the principal in obtaining or retaining the gun." *Id.* Encompassed within the encouragement and assistance of a principal's possession of a firearm is reliance "on that possession to intimidate [a] robbery victim and by specifically ensuring that the principal would be able to successfully enter and exit the scene of the crime while carrying the firearm." *Id.* As such, sufficient evidence was presented to support Jenkins's conviction of felony-firearm under an aiding and abetting theory based on the assistance Jenkins rendered to Sims and the second gunman by transporting them to the scene to use the weapons in their possession and awaiting their attempt to complete the crimes before facilitating their removal from the scene.

Affirmed.

/s/ Stephen L. Borrello
/s/ Kurtis T. Wilder
/s/ Cynthia Diane Stephens