# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CLARENCE EDWARD ROSS,

        Defendant-Appellant.

UNPUBLISHED
June 30, 2015

No. 321353
Kalamazoo Circuit Court
LC No. 2012-001925-FC

Before: BECKERING, P.J., and MARKEY and SHAPIRO, JJ.

PER CURIAM.

Defendant Clarence Edward Ross appeals by right his jury trial convictions of first-degree premeditated murder, MCL 750.316, solicitation to commit murder, MCL 750.157b(2), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). The trial court sentenced defendant to life in prison for first-degree murder, 35 to 75 years for solicitation to commit murder, and two years for felony-firearm. We affirm defendant's conviction and sentence for solicitation to commit murder. However, exclusively with regard to defendant's murder and felony-firearm convictions, we remand for a *Ginther*[1] hearing on defendant's claim that his trial counsel was ineffective for failing to secure the trial presence of two eyewitnesses to the subject shooting and retain jurisdiction.

## I. FACTS

Defendant was convicted of first-degree murder and felony-firearm for shooting and killing Jheryl Wright in the doorway of a Quick Stop convenience store in Kalamazoo. The prosecution's case was primarily reliant on the testimony of Adrian Travier, who testified that defendant told him that he had sought out and killed Wright because Wright had paid him counterfeit money in exchange for drugs. The prosecution also presented significant testimony regarding the non-fatal shooting of Suave Brooks, which had occurred approximately one to two miles away from the Quick Stop, at a home on Dutton Street, approximately three hours before the Quick Stop shooting. Travier testified that, some months after the shootings, defendant and his associate, Duncan Williams, offered to pay him to lure Ciero Farris to an isolated location so

---

[1] *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973).

they could kill her, as they had heard that she had been speaking with detectives regarding the Quick Stop and Dutton Street shootings. These actions resulted in defendant's conviction for solicitation to commit murder. While defendant was briefly detained in conjunction with the Dutton Street shooting, only Williams was charged and convicted in relation to that incident.

## A. DUTTON STREET SHOOTING

Approximately the first day and a half of testimony at defendant's trial concerned the Dutton Street shooting, as to which defendant was not charged. Brooks (the Dutton Street shooting victim) testified that at approximately 11:00 p.m. on the evening of September 29, 2012, he went with his friends Tyler Szatkowski, Will Dumont, and Kendall Evans to the home of his sister, Alaina Bloodworth, located at 128 Dutton Street. Already present in Bloodworth's home was her friend Farris. Brooks and his friends were somewhat surprised to see three other males in the home whom they knew little or not at all: defendant, Williams, and Terry Brown. The mood was described as somewhat uncomfortable. Soon after Brooks and friends arrived, Williams sought to purchase a small amount of marijuana from Szatkowski. However, once he saw the marijuana and believed it to be of lesser quality, Williams declined to make the purchase.

Approximately 15 minutes after Brooks and friends arrived, defendant, Williams, and Brown left Bloodworth's home. Approximately 15 minutes after that, there was a knock on Bloodworth's door. Brooks answered the door to find Williams, by himself. Williams, brandishing a firearm, demanded that Brooks give him marijuana; Brooks testified that he initially assumed Williams was joking. Williams was not—he struck Brooks in the face with the butt of the handgun and the two began fighting. Eventually, Williams retrieved the gun, which had fallen on the floor during the fight, shot Brooks in the stomach, and fled out the door. Brooks was taken to the hospital and recovered. Bloodworth stated that the shooter had been wearing a blue and red hat at the time of the shooting. Dumont stated that Williams had been wearing a blue and red hat when he saw him in the Dutton Street home earlier that evening.

Officers were promptly dispatched to the Dutton Street home at approximately 11:47 p.m. Officer Todd Neldon testified that he recovered one .45 caliber shell casing at the scene. Officer Michael Ferguson testified that he interviewed Bloodworth. She told Ferguson that she had attempted to jump on Brooks's shooter during their altercation and identified "George" as one of the people involved.[2] According to Michigan's Online Offender Tracking Information System (OTIS), Williams was convicted by plea of armed assault with intent to rob, MCL 750.89, in conjunction with the Dutton Street shooting and was sentenced to 15 to 25 years in prison.

Officer Anthony Evans testified that he saw three or four people about four blocks from the Dutton Street home after receiving his dispatch. Evans visually identified defendant and detained him at approximately 12:35 a.m. Evans testified that defendant was generally

---

[2] There was ample testimony at trial that defendant was nicknamed and frequently referred to as "George." This fact was not disputed by the defense.

cooperative and admitted to having been in the Dutton Street home, but denied any knowledge of the shooting. Defendant allowed officers to search his vehicle and his home, located on Burr Oak Court. The officers found nothing of interest in defendant's home, but Officer Evans testified that he recovered a blue and red hat from defendant's car. Defendant was released and officers left his home after approximately one hour.

Officer Michael Behnen, also dispatched to Dutton Street, arrived at defendant's home (where he was currently being detained) and interviewed Tamika Horn, a woman who had been walking with defendant. Horn claimed that she had been with defendant since at least 7:30 p.m. that evening and that they had not been to the Dutton Street home. Ferguson stated, however, that defendant told him that he had gone to the Dutton Street home to see Farris.

## B. QUICK STOP SHOOTING

Jheryl Wright was shot repeatedly in the doorway of the Quick Stop at approximately 3:15 a.m. on the morning of September 30, 2012. Police were promptly called. Behnen testified that, when he arrived at the Quick Stop, he saw Wright lying in the doorway of the store. Behnen stated that Wright appeared to be dead, and was later pronounced as such at the hospital at 3:40 a.m.

Neldon was dispatched to the Quick Stop directly from the Dutton Street home. When he arrived, he located six nine-millimeter shell casings, and two spent nine-millimeter bullets, in and around the Quick Stop. Neldon explained that these bullets were definitively fired from a different weapon than the bullet fired at Dutton Street.

There was an almost complete lack of physical evidence tying defendant (or anyone else) to the Quick Stop shooting. A surveillance tape was recovered and played for the jury. Although the tape is not part of the record before this Court, it appears that it showed a male figure with something obscuring his face shooting Wright. There were apparently only two eyewitnesses to the shooting, but neither testified at trial. Police reports in the lower court record indicate that Sarbjit Singh, a Quick Stop clerk, told police through an interpreter that the shooter was "a 19 to 20 year old black male approximately 5'11" with an average to skinny build." Mike Stanfill, who apparently witnessed the shooting from across the street, described the shooter in two police reports "as a tall/skinny [black male]" and "taller than 5-8, [and] thin."

Angela Ojeda testified that, although she was a Quick Stop employee, she normally worked the day shift and, therefore, was not present when Wright was shot. However, she worked the following day and testified that defendant came into the store. Defendant asked her what had happened and volunteered that he had been out of state at the time of the shooting. She stated that defendant told her he had briefly been detained in relation to the shooting. Ojeda testified that she did not see defendant again until some weeks later, when he stopped at the store, driving a U-Haul, and told her he was moving to Atlanta.

India Thigpen testified that she had two children with Wright. She stated that Farris had previously had a sexual relationship with Wright, and had sought to rekindle it at points, causing tension between Thigpen and Farris. Thigpen acknowledged that Wright smoked and sold marijuana. Thigpen testified that, on the night he was murdered, Wright left her home in a red

Mustang at approximately 3:00 a.m. to buy cigarettes and condoms from the Quick Stop. She also described two altercations between Wright and others that had occurred in the month prior to his murder: (1) Wright had been in a fight with an individual Thigpen identified as "Bobo," who Wright believed had "touched" his aunt and (2) Wright had an altercation with "Deuce" of the "C-Block" gang.

## C. TESTIMONY OF ADRIAN TRAVIER

Kent County parole officer Jason Wayne testified that Travier was paroled from prison to Grand Rapids on July 24, 2012. Travier testified that he absconded from parole on October 4, 2012, by moving to Kalamazoo. Wayne stated that, up until the absconding, Travier "was one of the better parolees I had[,]" "was drug free," and "was doing everything correct."

Travier testified that his brother reintroduced him to defendant soon after his arrival in Kalamazoo. Travier had known defendant when defendant was a child due to a dating relationship between their two families. Shawna Ross, defendant's sister, testified that Travier was like "family" to her and defendant's family.

Travier stated that, in October 2012, he was living at 1107 Hotop in Kalamazoo with his soon-to-be wife. He called defendant, who arrived at the home in his sister's car, a silver four-door Ford, and spoke with Travier in the driveway. The two sat in the car, discussing "different things that was going around here in Kalamazoo." They eventually visited members of defendant's family, and defendant dropped Travier off at his home after "close to an hour." Defendant knew that Travier had previously been imprisoned. Travier and defendant discussed "what's going on in the street" (i.e., criminal activity), and Travier told defendant that he was interested in making "cash" because he was "on the run." Defendant told Travier that he had been dealing cocaine and marijuana in an attempt to make enough money to move to Atlanta.

The day after this first meeting, defendant again drove to Travier's home and picked him up, again driving his sister's car. They drove to the home of defendant and Teyneisha Callahan[3] on Burr Oak Court and stayed in the car talking for approximately an hour. Travier also disclosed to defendant, for the first time, that he had absconded from parole. According to Travier's testimony, defendant told Travier that when defendant sold a half-brick of cocaine to an individual, the buyer slipped defendant $1,300 in counterfeit money. Defendant identified this buyer as Wright, the Quick Stop victim. Travier asked defendant if he ever got his money, and defendant stated, "I went looking for [Wright]." Travier asked what happened, and defendant replied, "we'll go into more detail later when Duncan [Williams] come around." Travier then testified:

> Well, the conversation was that [defendant] saw—he saw [Wright] at the Quick Stop. He was driving his sister car and Duncan was with him. And he said he saw him—He said he saw him as he was going in the store. He pulled down the alley, and he came around the corner, and he said he shot him and left him in

---

[3] Callahan was defendant's live-in girlfriend at the time. Her testimony is described below.

-4-

the doorway. And he bent the corner, gave the weapon to Duncan, and they drove off.

Defendant told Travier that he was wearing a mask when he shot Wright and that he took the gun used the Quick Stop shooting with him to Atlanta.

A few hours later, on the same day, defendant arrived with Williams, in defendant's sister's car, and picked up Travier. The three began discussing the Quick Stop shooting "and a female came up that [defendant] was going out with named Teyneisha." "[Defendant] is like my girl was—my girl was in jail, and she heard this bitch talking." "And then he was telling me that [Callahan] was in jail and she overheard a female being pulled in and out of the cell talking to the detective about the murder that took place at the Quick Stop." Defendant then told Travier that, "I need to get rid of this bitch." "[H]e's like this is the only thing they got against me, but I got to get away from here; I'm trying to get to Atlanta."

Defendant identified this woman as Farris and told Travier that he had her phone number. Travier testified that defendant told him, "I want you to pretend like you met her somewhere and got her number; and I want you to lure this bitch somewhere, and me and Duncan's going to off her . . . and we'll pay you." Travier explained that this meant that Williams and defendant intended to murder Farris. Defendant then showed Travier a picture of Farris on his phone and offered to pay Travier between $1,500 and $1,800 for his help. Travier stated that, during this conversation, defendant "was orchestrating the whole thing" and that Williams was sitting in the back seat.

While sitting in the car, Travier twice called Farris as instructed, but she did not pick up her phone. Following these failed calls, Travier got out of the car and went into his home; defendant told him that he would be back later with Williams and Callahan. However, defendant did not come back to Travier's home until the following day. He was again driving his sister's car, accompanied by Williams and Callahan. Travier walked out and got in the car. "Once I got in the car, the conversation took place about [Callahan] being in the county [jail] with Ciero and that's how she got her number and Ciero had been talking to detectives about the murder, being pulled in and out of her cell." Travier stated that Callahan confirmed that she had seen/heard that Farris had discussed the Quick Stop shooting with detectives. The quartet drove "down to the South Side," looking for Farris but could not find her; Travier was then dropped off at his home.

Travier testified that defendant arrived at his home, again driving his sister's car, the following day. While driving, Travier saw a man he knew from prison and asked defendant to stop. Defendant refused to, stating that the man was friends with the person he killed. Defendant later dropped Travier off at his home; Travier called defendant later that day when he learned that detectives had come to his home while he was away.

Cory Ghiringhelli, a Kalamazoo detective, testified that he had been one of the police officers who had arrived at Travier's home on December 13, 2015, just under three months from the date of the Quick Stop murder. He stated that an anonymous person had called the police department and stated that Travier had information regarding a murder and that he was a parole absconder. This source also stated that the murder suspect went by the name of "George." He

-5-

learned that Travier was residing at 1107 Hotop and left his business card there with Travier's wife.

After learning that the police had been to his home, Travier called Wayne, his parole officer. Wayne recommended that he turn himself in to Kalamazoo police and Travier agreed. Ghiringhelli testified that Travier called him at approximately 4:15 p.m. on the date he left his business card and the two made arrangements for detectives to pick up Travier the following morning at 10:00 a.m. Ghiringhelli and his partner, Brian Beauchamp, picked up Travier as scheduled.

On the way to police headquarters, Travier brought up the murder without prompting. Travier told the detectives that defendant had confessed to killing Wright at the Quick Stop and discussed defendant's plan to murder Farris. Travier also told Ghiringhelli that the Quick Stop and Dutton Street shootings were "connected," in that defendant was involved in both. Ghiringhelli testified that Travier identified defendant as a "large scale drug dealer" and told him that defendant killed Wright because he was upset that Wright had given him counterfeit currency in exchange for drugs.

Ghiringhelli and Beauchamp convinced Travier to call defendant (who was then residing in Atlanta) in order to obtain incriminating evidence. Travier called defendant three times; twice defendant answered and once the call went to voice mail. Each time, Travier identified the responding voice as defendant's.[4]

In the first call, Travier told defendant that he had located Farris and asked the amount of money defendant was willing to pay him. Travier testified that defendant responded that he was "putting money together—and that he'll get back with me." Travier also stated that he asked defendant whether he "still want [] to do this [him]self" and defendant responded in the affirmative. After this conversation, Travier (with the help of the police) texted a picture of Farris to defendant, asking if the individual pictured was the correct woman. Defendant responded, via text message, that it was.

A few minutes later, Travier again called defendant, apparently to confirm that he had received the picture of Farris. During this conversation, Travier also asked defendant where he could obtain a "burner," i.e., a firearm. Defendant told him he could obtain same from "[t]he Mexican next door to where he lived on Burr Oak Court."[5] Ghiringhelli admitted that defendant did not identify himself by name in any of the phone calls and there was no voice analysis conducted of the recordings.

---

[4] Recordings of these phone calls were played for the jury. However, the record before this Court contains neither the recordings nor transcripts thereof.

[5] Travier stated that defendant told him that this individual "had pounds of weed and a lot of guns." Police later searched this home and located a marijuana growing operation and one shotgun.

## D. TESTIMONY OF TEYNEISHA CALLAHAN

Callahan testified that she had known defendant since December 2011 and that, at the time of the shootings, they were in a relationship and living together. She was present in the home when it was searched by police after the Dutton Street shooting. Callahan testified that, after the police left, Williams arrived with blood on his shirt; he had "a lot" "all over him." Callahan did not hear all of Williams's conversation with defendant, but heard Williams say "basically that he shot somebody" and, "No, I didn't kill him." After speaking with Williams, defendant left the home and was still not home when Callahan awoke at approximately 4:00 or 5:00 a.m. Callahan first saw defendant again at 11:00 a.m. or 12:00 p.m. the following day. She stated that she had seen defendant with a gun in the home prior to the shootings, but never after.

Callahan also testified that she resided in the same county jail cell as Farris in October 2012.[6] She stated that she saw Farris speak with detectives, but that Farris only told her that she, defendant, and Williams had set someone up to be robbed; Callahan denied that Farris ever told her that she spoke with police about either the Dutton Street or Quick Stop shootings. Callahan did state that, after being released from jail, she was present in the vehicle when defendant showed a picture of Farris on his phone to Travier, mentioning that Farris "knew too much." She testified that defendant seemed "unhappy" that Farris had been speaking to the police.

Finally, Callahan testified that defendant was driving a white or silver rental car at the time of the shootings. She further stated that, before defendant's trial, she had spoken with one of defendant's sisters, whom she identified as "Precious." Callahan stated that Precious contacted her through Facebook, "[b]asically saying that I better not go" testify at defendant's trial. Callahan stated that she interpreted this as a threat not to testify, or at least to testify in favor of defendant. She also stated that one of defendant's aunts came to her place of work and "was like questioning me and like, well, you better not tell."

## E. INTERVIEWS WITH DEFENDANT

Shortly after the police observed Travier make the phone calls to defendant, defendant and Williams were arrested in Atlanta by FBI personnel. Kalamazoo detective Sheila Goodell testified that she was the lead detective on Wright's murder. She testified that it would take less than five minutes to drive from Dutton Street or defendant's home to the Quick Stop. She stated that she traveled to Atlanta to interview defendant and Williams. Goodell advised defendant of his rights and testified that he voluntarily spoke with her.

When asked about the Dutton Street shooting, defendant first "said we would need to talk to [Williams] regarding that and that he didn't have any information on that." However, "eventually, he admitted that he went to the Dutton Street location" "with Terry Brown and Duncan Williams." Defendant admitted that he was a marijuana dealer and had gone to the home to sell marijuana to Farris. Defendant told Goodell that he left the home with Brown and Williams, returned to his home on Burr Oak Court, and stayed there until the following

---

[6] Both Callahan and Farris were in jail regarding matters unrelated to this case.

afternoon. He claimed that Brown and Williams returned to Dutton Street. Goodell confronted defendant with phone records demonstrating that Callahan had been calling him during the time he claimed to have been at his home. Defendant then altered his story, stating that he had been with his friend, G.L. Winston, at a home on Rose Street, "until the early morning hours."

Defendant told Goodell that he had traveled to Atlanta in a U-Haul rented by Travier.[7] Goodell asked defendant if he had planned to kill Farris, and defendant responded, "if I wanted her dead, she'd be dead." When confronted with the recorded phone calls with Travier, defendant initially denied that it was his voice on the calls, claiming it to be the voice of Williams. When Goodell told defendant the police had spoken with Travier, defendant changed his story, admitting that it was his voice, but claiming that he had participated in the calls "under the direction of Duncan Williams."

When defendant was eventually returned to custody to Kalamazoo, he repeatedly called Goodell, requesting to speak with her. Defendant had become aware that Travier was cooperating with police. Defendant admitted to Goodell that Farris and another individual were to be killed and that the person would be paid $1,500 for each murder. Defendant eventually claimed that Williams had shot Wright.

Goodell also described several other suspects that had been investigated for Wright's murder and discussed how the police investigated individuals who had been in previous physical altercations with Wright.

## F. TRIAL COURT PROCEEDINGS

On December 20, 2013, after a seven-day trial, the jury found defendant guilty as charged. Defendant did not testify.

On May 22, 2014, defendant's appellate counsel moved the trial court for a new trial. Counsel first argued that defendant was deprived of a fair trial because the prosecution failed to call as witnesses Singh and Stanfill, who the police reports identified as the only eyewitnesses to the Quick Stop shooting and purportedly provided physical descriptions differing from that of defendant. Appellate counsel next argued that trial counsel was ineffective for failing to secure the presence of Singh and Stanfill and to call Steven Dean and Gerry Winston. Counsel attached affidavits from these second two men, which purportedly provide defendant with an alibi for the time of the Quick Stop shooting. Dean averred that, on the night of the shooting, he was present at a birthday party held on Rose Street. Dean stated that he arrived at the party between 8:30 and 9:00 p.m., stayed for "3-4 hours," and that defendant was present the entire time. Winston averred that he was at the same party, with defendant, Dean, Tamika Horn, and Williams, among

---

[7] Travier testified that, prior to turning himself in, he rented a U-Haul trailer for defendant in his own name, at defendant's request. The manager of the subject U-Haul facility confirmed that someone presenting Travier's identification had rented a trailer.

others. Winston further stated that defendant was present at the party until at least 2:30 or 3:00 a.m. Winston averred that he had spoken with defendant's trial counsel and told him these facts, but had never been served with a subpoena. In light of these facts, appellate counsel requested that a new trial be granted or, alternatively, that an evidentiary hearing be held to obtain the testimony of Singh and Stanfill, as well as determine whether trial counsel was ineffective. The court denied defendant's motions in their entirety, essentially ruling that despite the presumed testimony of Singh and Stanfill and the purported alibi testimony, there was ample independent evidence from which the jury could have found defendant guilty as charged.

## II. ANALYSIS

### A. DUTTON STREET SHOOTING EVIDENCE

Defendant argues that the trial court abused its discretion in admitting evidence of the Dutton Street shooting under the res gestae exception.[8]

The trial court ruled that evidence of the Dutton Street shooting was admissible under the "res gestae exception." "Under that exception, evidence of prior 'bad acts' is admissible where those are 'so blended or connected with the (charged offense) that proof of one involves the other or explains the circumstances of the crime.'" *People v Robinson*, 128 Mich App 338, 340; 340 NW2d 303 (1983), quoting *People v Delgado*, 404 Mich 76, 83; 273 NW2d 395 (1978). Put another way, "res gestae" has been described as "the facts which so illustrate and characterize the principal fact as to constitute the whole transaction, and render the latter necessary to exhibit the former in its proper effect." *People v Castillo*, 82 Mich App 476, 479-480; 266 NW2d 460 (1978). This exception is itself an exception to MRE 404(b) and, therefore, does not require the procedural necessities associated with introducing evidence under that evidentiary rule. See *Robinson*, 128 Mich App at 340.

The prosecution argued that evidence of the Dutton Street shooting was necessary to establish the circumstances that led to defendant seeking to kill Farris, the basis of his conviction for solicitation to commit murder. Farris testified that she saw Williams shoot Brooks and there was significant testimony that she was speaking with the police regarding what she witnessed that evening. The prosecution asserted at trial that defendant was "involved" in Brooks's shooting, but did not insinuate that defendant perpetrated the crime. Indeed, in closing, the prosecutor stated, "We know that . . . Duncan Williams shot Suave Brooks in the stomach. We know it. He's been identified as the person that did it by Suave Brooks, by his sister; and he pled guilty to it. No question about it." However, as the prosecutor noted, and the testimony established, Williams was wearing a red and blue hat when he shot Brooks, a hat that was later recovered in the car searched outside of defendant and Callahan's house. There was also testimony from Callahan that Williams arrived, covered in blood, to speak with defendant after

---

[8] "We review for an abuse of discretion a trial court's decision regarding the admission of evidence." *People v Katt*, 248 Mich App 282, 289; 639 NW2d 815 (2001). "However, this Court reviews de novo whether a rule of evidence precludes the admission of the evidence." *People v Powell*, 303 Mich App 271, 276; 842 NW2d 538 (2013).

the Dutton Street shooting. This evidence helped establish the motive for defendant's and Williams's mutual desire to murder Farris. Because Farris was not an eyewitness to the Quick Stop and offered no testimony regarding that crime, absent evidence of the Dutton Street shooting, the jury would only have heard the disjointed allegation that defendant and Williams wanted to kill Farris for some unknown reason. In other words, the Dutton Street shooting was necessary to illuminate defendant's solicitation charge "in its proper effect." Put another way, the Dutton Street evidence "explains the circumstances" of the solicitation crime.

Accordingly, the trial court did not abuse its discretion in admitting evidence of the Dutton Street shooting under the res gestae exception.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he is entitled to a new trial or, alternatively, a remand for *Ginther* hearing, on his claims that his counsel was ineffective for failing to secure the presence of the two eyewitnesses to the Quick Stop shooting or investigate and/or present purported alibi witnesses.[9]

The right to the effective assistance of counsel is guaranteed by the United States and Michigan constitutions. US Const Am VI; Const 1963, art 1, § 20; *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039, 80 L Ed 2d 657 (1984); *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010). "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *Swain*, 288 Mich App at 643. "To prove a claim of ineffective assistance of counsel, a defendant must establish that counsel's performance fell below objective standards of reasonableness and that, but for counsel's error, there is a reasonable probability that the result of the proceedings would have been different." *Id.*

## 1. PURPORTED ALIBI WITNESSES

Defense counsel was not ineffective for failing to present the testimony of defendant's purported alibi witnesses, Dean and Winston. An attorney's decision whether to present witnesses is generally a matter of trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). "In general, the failure to call a witness can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense." *Id.* (quotation marks and citation omitted). In this case, counsel's failure to call these two witnesses did not deprive

---

[9] "This Court reviews for an abuse of discretion a trial court's decision to grant or deny a motion for a new trial. An abuse of discretion occurs when the trial court renders a decision falling outside the range of principled decisions." *Powell*, 303 Mich App at 276-277 (2013) (quotation marks and citation omitted). "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "Findings on questions of fact are reviewed for clear error, while rulings on questions of constitutional law are reviewed de novo." *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

defendant of a substantial alibi defense because neither witness actually provided defendant with an alibi. Dean averred that he arrived at the Rose Street party between 8:30 and 9:00 p.m. and stayed for "3-4 hours," during which defendant was present the entire time. Thus, the latest Dean could place defendant on Rose Street was 1:00 a.m., and the Quick Stop shooting occurred over two hours after that time. Similarly, Winston's affidavit provides that defendant was present at the Rose Street party until 2:30 or 3:00 a.m. However, the Rose Street home is less than one mile, or a three-minute drive, from the Quick Stop. The Quick Stop shooting occurred at approximately 3:15 a.m. and there is no evidence that the shooter had been in the immediate area or at the Quick Stop for any significant amount of time prior to the shooting. Thus, neither Dean nor Winston provided defendant with an alibi for the Quick Stop shooting. To the extent that their affidavits contradict the testimony that defendant was present in the Dutton Street home, counsel's decision not to present their testimony was one of reasonable trial strategy. Defendant eventually admitted to police that he had been at the Dutton Street home. There was also testimony from at least four witnesses placing defendant in that home and counsel could have strategically decided not to challenge that assertion, especially since it was not inherently critical to the prosecution's case. Moreover, trial counsel filed a notice of alibi defense in these proceedings listing Dean and Winston as alibi witnesses, indicating that he considered their testimony and its effect on defendant's defense, yet made the reasonable strategic decision not to present it. Finally, because Dean and Winston did not provide defendant with an alibi, there is not a reasonable probability that counsel's failure to present their testimony affected the outcome of defendant's trial.

## 2. EYEWITNESS TESTIMONY

Defense counsel's failure to subpoena or attempt to secure Stanfill and Singh for trial may have fallen below objective standards of reasonableness. These individuals were the only two identified eyewitnesses to the shooting of Wright and were identified by name in the police reports and prosecution witness lists, thus making defense counsel aware of their existence. The police report states that Singh described the shooter as "a 19 to 20 year old black male approximately 5'11" with an average to skinny build." The report states that Stanfill described the shooter "as a tall/skinny [black male]." In another report, Stanfill told police that the shooter was a black male, "taller than 5-8, [and] thin." The record does not contain a precise physical description of defendant, but his appellate attorney has represented to this Court that defendant is stocky and short. While the decision of what witness testimony to present is generally a matter of trial strategy, *id*., it is difficult to imagine how the failure to interview or present the testimony of the only two eyewitnesses to Wright's shooting could be strategic if their descriptions of the shooter were inconsistent with defendant's actual physical description.

To be entitled to a new trial, defendant must also establish that, but for counsel's failure to produce Singh and/or Stanfill, there is a reasonable probability that the outcome of his trial would have been different. We conclude that, because the trial court denied defendant's motion for a *Ginther* hearing, an insufficient record exists to make this determination. Given that the only two eyewitnesses may have given the police physical descriptions of a shooter inconsistent

with defendant, the trial court should have conducted a *Ginther* hearing.[10]  The trial court's conclusion that a new trial could be denied because there was other evidence of guilt is an error of law.  We agree that there was sufficient evidence to convict defendant of the charges arising from Wright's murder.  However, the issue is not whether there was sufficient evidence, but whether the addition of the additional witnesses would have resulted in a reasonable probability of a different verdict.  Given the lack of physical or direct evidence implicating defendant, Singh and/or Stanfill's testimony might provide such a reasonable probability.  Moreover, while there was ample evidence of defendant's guilt on the solicitation of murder charge, the evidence as to the murder of Wright, while sufficient, was less substantial.  Thus, we remand for a hearing limited to obtaining Singh and Stanfill's testimony as well as defense counsel's rationale for not attempting to secure their presence at trial.  Only with this testimony can it properly be determined whether counsel's failure was the product of trial strategy and/or whether there is a reasonable probability that Singh and/or Stanfill's testimony would have affected the outcome of the trial.  Accordingly, the trial court abused its discretion by denying defendant's motion for a *Ginther* hearing.  On remand, the *Ginther* hearing shall only concern defendant's convictions for murder and felony-firearm.  Singh and/or Stanfill's testimony has no bearing on defendant's conviction for solicitation to commit murder.

### 3.  ADDITIONAL STANDARD 4 CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant's claim that counsel failed to investigate perjury and corruption in this investigation are conclusory and without adequate explanation.  Defendant's Standard 4 brief summarizes several police interviews with witnesses not produced at trial that, it appears, he argues support his positions that Wright was a drug dealer, involved in criminal activity, and that other individuals had a motive to kill him.  Each of these facts was established at trial and counsel repeatedly questioned witnesses regarding Wright's activities and the fact that he had been in recent physical altercations with individuals other than defendant.  In other words, counsel adequately pursued the strategy that defendant appears to assert on appeal.  As to defendant's other claims, there is simply no evidence to suggest that the police intimidated witnesses, falsified reports, tampered with evidence, or obstructed justice.

Defendant claims that counsel failed to properly impeach[11] Travier at trial and have a "voice analysis" performed on the recorded phone calls.  In fact, counsel conducted a lengthy

---

[10] Identity is an element of every offense.  *People v Yost*, 278 Mich App 657, 661; 683 NW2d 761 (2004).

[11] As part of his claims that counsel failed to properly impeach the testimony of Travier, Callahan, and others, defendant appears to have nitpicked the police reports and found "inconsistencies" between the accounts given therein and the testimony at trial.  We have reviewed the relevant reports and testimony and believe these claims to be wholly without merit.  First, defendant's cited instances do not constitute inconsistencies; at best, there are minor details that appear to have changed once fully explored at trial.  Second, the police reports do not contain direct accounts, but rather police summaries of the statements made during interviews.  Third, the alleged inconsistencies are not related to material facts, i.e., Travier did not suddenly

cross-examination of Travier and attempted to challenge his credibility. The police reports do not contain statements made by Travier in significant contradiction to his testimony at trial. Counsel also challenged the assertion that it was defendant's voice on the recorded phone calls, insinuating that a different voice was present on at least one of the calls. Moreover, defendant has not established how conducting a "voice analysis" reasonably would have affected the outcome of the trial. There was testimony that defendant eventually admitted that it was his voice on the recordings, Travier testified that he called the phone number he had previously used for defendant, and the responding voice had knowledge of defendant's previous conversations with Travier. It is likely that the responding voice was that of defendant and, had the voice analysis been performed, it is possible that it would have confirmed that fact, further weakening defendant's case. Thus, defendant has failed to overcome the presumption that counsel's decision not to conduct a voice analysis was one of reasonable trial strategy.

Defendant also claims the counsel failed to properly impeach Callahan at trial with statements she previously made to police. In particular, defendant appears to argue that Callahan changed her story regarding whether she had ever seen Williams and/or defendant with a gun. Callahan's statements as described in the police report are not inconsistent with her testimony at trial. In any event, defendant has not explained how, even if this testimony was impeached, it affected the outcome of his trial.

Defendant claims that his counsel failed to properly inform him of his right to testify. Defendant had offered no evidence to support this assertion or to contradict counsel's statement to the court that defendant informed him that he did not wish to testify. Moreover, defendant has offered no argument as to how his testimony would have affected the outcome of the trial.

Regarding counsel's failure to object to allegedly improper remarks by the prosecutor, the prosecutor was free to argue the facts in evidence and reasonable inferences therefrom. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). Thus, any objection by counsel would have been futile, and counsel is not ineffective for failing to make meritless objections. *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012). In any event, the jury was instructed that the prosecutor's statements were not evidence, and juries are presumed to follow their instructions. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). Thus, even if the prosecutor's challenged statements were improper, there is no reasonable probability that they affected the outcome of defendant's trial.

Defendant claims that his counsel "abandoned" the defense of actual innocence. This assertion is factually incorrect. Counsel maintained that defendant did not shoot Wright and attempted to create reasonable doubt that it was defendant's voice on the recorded phone calls and impugn Travier's credibility. Defendant's claim that counsel was ineffective for failing to object to the aiding and abetting instruction is similarly without merit. This instruction went to

---

identify defendant's voice at trial and Callahan did not, for the first time at trial, state that she had previously seen defendant with a gun. Finally, counsel conducted lengthy cross-examinations, attempting to challenge the witnesses' credibility and their accounts of events. The fact that these cross-examinations apparently did not sway the jury does not render his representation ineffective.

-13-

the solicitation charge. The prosecution presented sufficient evidence to obtain that instruction and, indeed, defendant's conviction. Contrary to defendant's implication, the prosecution never argued that defendant aided and abetted Wright's murder, only that he directly committed it himself. Thus, counsel's failure to object to the aiding and abetting instruction did not constitute ineffective assistance.

Finally, there being no error in counsel's representation (outside of the discussed possibility of his failure to produce Singh and/or Stanfill), there can be no cumulative error that operated to render his representation ineffective.

## C. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the prosecution presented insufficient evidence to support his convictions.[12]

> In ascertaining whether sufficient evidence was presented at trial to support a conviction, this Court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. A reviewing court is required to draw all reasonable inferences and make credibility choices in support of the trier of fact's verdict. [*People v Strickland*, 293 Mich App 393, 399; 810 NW2d 660 (2011) (quotation marks and brackets omitted).]

### 1. FIRST-DEGREE MURDER AND FELONY-FIREARM

"In order to convict a defendant of first-degree murder, the prosecution must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v Kelly*, 231 Mich App 627, 642; 588 NW2d 480 (1998). "Premeditation and deliberation require sufficient time to allow the defendant to take a second look." *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011) (quotation marks and citation omitted). "[I]t is well settled that identity is an element of every offense." *Yost*, 278 Mich App at 661.

Travier's testimony was sufficient to allow a reasonable jury to conclude that defendant committed first-degree premeditated murder. Travier testified unequivocally that defendant told him more than once that he had shot and killed Wright at the Quick Stop. Travier also testified that defendant told him that he killed Wright in retaliation for Wright paying him for drugs with counterfeit money. Although not specifically established a trial, it is clear that this drug transaction occurred some days, weeks, or months prior to Wright's death. Travier also testified that defendant told him he "went looking for" Wright. When he saw Wright entering the Quick Stop, he pulled his car around the store, exited, and shot Wright. This testimony establishes that defendant intended to kill Wright (he went looking for him), and deliberately murdered him.

---

[12] Whether a defendant's conviction was supported by sufficient evidence is reviewed de novo. *People v Harverson*, 291 Mich App 171, 177; 804 NW2d 757 (2010).

Based on Travier's testimony, defendant had ample time to "to take a second look" and, declining to do so, methodically and deliberately killed Wright, firing at least six bullets in his direction. To the extent defendant offered contradictory evidence, it is the province of the jury to determine witness credibility and weigh the evidence, *Unger*, 278 Mich App at 222, and Travier's testimony, which the jury apparently believed, afforded it a sufficient basis to find defendant guilty of first-degree premeditated murder and felony-firearm. However, we must stop short of explicitly affirming these two convictions because, as discussed, a *Ginther* hearing must be held.[13]

## 2. SOLICITATION TO COMMIT MURDER

> Solicitation to commit murder is a specific intent crime that requires proof that the defendant intended that a murder would in fact be committed. Solicitation to commit murder occurs when (1) the solicitor purposely seeks to have someone killed and (2) tries to engage someone to do the killing. Solicitation is complete when the solicitation is made. [*People v Crawford*, 232 Mich App 608, 616; 591 NW2d 669 (1998) (citations omitted).]

Based on the testimony of Travier and Callahan, as well as the recorded phone calls between defendant and Travier, there was sufficient evidence for the jury to conclude that defendant "purposely [sought] to have someone killed[,]" that someone being Farris. While there is no evidence that defendant attempted to solicit Travier to actually kill Farris, there is ample evidence that defendant solicited Travier to aid and abet Farris's murder. A finding that a defendant aided and abetted a crime requires evidence that (1) the crime was committed by defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted in the commission of the crime, and (3) the defendant intended the commission of the crime or knew that the principal intended its commission when defendant gave aid and encouragement. *People v Izarraras-Placante*, 246 Mich App 490, 495-496; 633 NW2d 18 (2001). Had defendant's plan been consummated, it is unquestionable that (1) Farris would have been murdered, (2) defendant would have performed acts (in the form of payment and encouragement) to assist Travier in luring Farris to defendant and Williams, and (3) defendant would have known that Travier lured Farris for the purpose of her being murdered. Because aiders and abettors are punished as if they had directly committed the crime, *id*. at 495, the jury was presented with sufficient evidence to conclude that defendant was guilty of solicitation to commit murder.

## D. PROSECUTION'S FAILURE TO PRODUCE WITNESSES

---

[13] We have addressed defendant's sufficiency argument due to the differing remedy available. Were defendant to prevail on this argument with regard to his murder and felony-firearm convictions, he would be entitled to acquittal, not retrial. *People v Mitchell*, 301 Mich App 282, 294; 835 NW2d 615 (2013). However, in the event that defendant prevails on his claim of ineffective assistance of counsel following the *Ginther* hearing on remand, he is only entitled to a new trial.

Defendant argues that he was deprived of his due-process rights by the prosecution's failure to produce eyewitnesses Singh and Stanfill, as well as alibi witnesses Dean and Winston.[14]

MCL 767.40a provides in relevant part:

(1) The prosecuting attorney shall attach to the filed information a list of all witnesses known to the prosecuting attorney who might be called at trial and all res gestae witnesses known to the prosecuting attorney or investigating law enforcement officers.

(2) The prosecuting attorney shall be under a continuing duty to disclose the names of any further res gestae witnesses as they become known.

(3) Not less than 30 days before the trial, the prosecuting attorney shall send to the defendant or his or her attorney a list of the witnesses the prosecuting attorney intends to produce at trial.

(4) The prosecuting attorney may add or delete from the list of witnesses he or she intends to call at trial at any time upon leave of the court and for good cause shown or by stipulation of the parties.

(5) The prosecuting attorney or investigative law enforcement agency shall provide to the defendant, or defense counsel, upon request, reasonable assistance, including investigative assistance, as may be necessary to locate and serve process upon a witness. The request for assistance shall be made in writing by defendant or defense counsel not less than 10 days before the trial of the case or at such other time as the court directs. If the prosecuting attorney objects to a request by the defendant on the grounds that it is unreasonable, the prosecuting attorney shall file a pretrial motion before the court to hold a hearing to determine the reasonableness of the request.

Applying this statute, this Court has stated:

A prosecutor who endorses a witness under MCL 767.40a(3) is obliged to exercise due diligence to produce that witness at trial. A prosecutor who fails to produce an endorsed witness may show that the witness could not be produced despite the exercise of due diligence. If the trial court finds a lack of due diligence, the jury should be instructed that it may infer that the missing witness's testimony would have been unfavorable to the prosecution's case. [*People v Eccles*, 260 Mich App 378, 388; 677 NW2d 76 (2004).]

---

[14] "Questions whether a defendant was denied a fair trial, or deprived of his liberty without due process of law, are reviewed de novo." *People v Steele*, 283 Mich App 472, 478; 769 NW2d 256 (2009).

Both Stanfill and Singh were listed as witnesses the prosecution "intends to produce" on a witness list filed July 23, 2013. On an amended list, filed the following day, Singh, but not Stanfill, appeared on the list of witnesses the prosecution intended to produce. Stanfill appeared on the attached list of "further known witnesses."

As a preliminary matter, Stanfill and Singh were undoubtedly "res gestae witnesses." A res gestae witness is any individual who witnessed some event in the continuum of the criminal transaction and their testimony would aid in developing a full disclosure of the facts at trial. *People v Long*, 246 Mich App 582, 585; 633 NW2d 843 (2001). Stanfill and Singh both witnessed Wright's shooting, and "[p]ersons present at the scene of a crime are presumed to be res gestae witnesses" unless the prosecution proves otherwise. *People v Lamar*, 153 Mich App 127, 137-138; 395 NW2d 262 (1986), superseded by statute as stated in *People v Calhoun*, 178 Mich App 517, 517; 444 NW2d 232 (1989).

"The prosecution's duty under the statute is to provide notice of known witnesses and reasonable assistance to locate witnesses *on a defendant's request.*" *People v Gadomski*, 232 Mich App 24, 35-36; 592 NW2d 75 (1998) (emphasis added). "Put in other terms, the prosecutor's duty to produce res gestae witnesses was replaced with the duty to provide notice of known witnesses and to give reasonable assistance in the locating of witnesses *if a defendant requests such assistance.*" *People v Snider*, 239 Mich App 393, 423; 608 NW2d 502 (2000) (emphasis added).

The prosecution, at minimum, was required to exercise due diligence to secure Singh's presence at trial because he was present on the prosecution's final list of witnesses it intended to call. Because defense counsel apparently did not request the prosecution's assistance in producing Singh nor request a missing witness instruction, the trial court did not conduct a due diligence hearing. As such, the record before this Court is insufficient to determine whether the prosecution failed to exercise due diligence in failing to produce Singh. However, we need not address the question of due diligence because, as discussed above, we remand for a *Ginther* hearing as to whether defense counsel was ineffective in regard to Singh and/or Stanfill's failure to appear at trial. Defense counsel's apparent failure to request the prosecution's assistance in procuring either witness and/or requesting a missing witness instruction is subsumed within those questions.

With regard to defendant's related argument that the prosecution failed to investigate or endorse Dean or Winston as alibi witnesses, this Court has held that the prosecution has no affirmative duty to search for evidence or witnesses to aid in a defendant's case. See *People v Coy*, 258 Mich App 1, 21; 669 NW2d 831 (2003). Moreover, as discussed above, neither Dean nor Winston actually provided defendant with an alibi for the Quick Stop shooting.

Accordingly, defendant was not deprived of due process by these alleged errors of the prosecution.

E. PROSECUTORIAL MISCONDUCT

Defendant asserts the following errors on the part of the prosecution, with little elaboration, that he argues require reversal: (1) the prosecution failed to "fully investigate" the

case against defendant by (a) failing to identify the anonymous caller that led the police to Travier and (b) failing to investigate other individuals that defendant purports had a motive to kill Wright; (2) the prosecution failed to conduct a "voice analysis" to determine whether it was defendant's voice on the phone calls with Travier played before the jury; (3) the prosecution knowingly or negligently introduced false testimony from Travier; (4) the police and prosecution intimidated Callahan into falsely testifying against defendant; (5) the prosecution failed to give proper notice of prior bad acts evidence it used against defendant; (6) the prosecutor improperly opined on defendant's guilt during closing arguments, and; (7) the cumulative effect of the prosecution's errors necessitates reversal.[15]

Defendant's argument that the prosecution failed to "fully investigate" Wright's murder, primarily bolstered by insinuations that other members of the community had motives to kill Wright, is without merit. Our Supreme Court has consistently held that

> the prosecutor need not negate every reasonable theory consistent with innocence. Instead, the prosecution is bound to prove the elements of the crime beyond a reasonable doubt. It is not obligated to disprove every reasonably theory consistent with innocence to discharge its responsibility; it need only convince the jury in the face of whatever contradictory evidence the defendant may provide. [*People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (quotation marks and citation omitted).]

The prosecution was not obligated to disprove any other theories of the murder nor investigate unnamed members of the community whom defendant maintains had the motive to kill Wright. Moreover, there was testimony adduced at trial that Wright was a drug dealer and had physical altercations with other community members, including a purported gang. There was also testimony that the police investigated other individuals for Wright's murder, including those who had been in a recent physical altercation with Wright. There is no indication that the police or prosecution improperly focused their investigation on defendant and, accordingly, this claim of error fails.

Defendant is also not entitled to relief on his claim that the prosecution was required to identify the caller who told the police that Travier had information about Wright's murder. Caselaw concerning anonymous tips primarily relates to whether use of such a tip may provide a police officer with the reasonable suspicion necessary to conduct a warrantless search. See, e.g., *People v Faucett*, 442 Mich 153; 499 NW2d 764 (1993). That situation is not present in this case. The anonymous tip merely stated that Travier had information regarding Wright's murder. Detectives used this tip to contact Travier, who knowingly and voluntarily provided information

---

[15] "We review claims of prosecutorial misconduct case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial. However, a defendant's unpreserved claims of prosecutorial misconduct are reviewed for plain error." *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001) (citations omitted).

implicating defendant. This information, combined with the phone communications between Travier and defendant in the presence of the police, provided ample cause for defendant's arrest. Finally, the tip itself, while mentioned at trial, was not used as material evidence against defendant. It was merely used to indicate how police became aware of Travier's involvement and knowledge. For these reasons, defendant's claim is without merit.

The prosecution was also not required to conduct a "voice analysis" of the recordings of the phone calls played for the jury:

> Absent a showing of suppression of evidence, intentional misconduct, or bad faith, the prosecutor and the police are not required to test evidence to accord a defendant due process. Nor does due process require that the prosecution seek and find exculpatory evidence. Although the prosecution bears the burden of proving guilt beyond a reasonable doubt in a criminal trial, it need not negate every theory consistent with defendant's innocence, nor exhaust all scientific means at its disposal. . . . [N]either the prosecution nor the defense has an affirmative duty to search for evidence to aid in the other's case. [*Coy*, 258 Mich App at 21 (citations omitted).]

There is no allegation of suppression of evidence, intentional misconduct, or bad faith relating to the introduction of the recorded phone calls. Defense counsel did not object to their admission and was apparently provided with the recordings and transcripts thereof in advance of trial. Travier stated that the phone calls were placed to the phone number he had for defendant and identified the receiving voice as that of defendant. There is also no indication that defense counsel was deprived of the opportunity to conduct an independent voice analysis. Finally, there was testimony that defendant admitted to police that it was his voice on the recordings. Accordingly, defendant is not entitled to relief on this claim.

Defendant argues that he is entitled to reversal because the prosecution introduced evidence of his prior bad acts, i.e., his possible involvement in the Dutton Street shooting, without providing notice as required under MRE 404(b). However, as discussed, the prosecution successfully introduced this evidence under the res gestae exception, which falls outside the procedural strictures of MRE 404(b). *Robinson*, 128 Mich App at 340. Accordingly, defendant is not entitled to relief on this claim.

There is no evidence to support defendant's claim that the prosecution knowingly or negligently induced Travier to testify falsely. Moreover, substantial portions of his testimony were corroborated by other witnesses. Ghiringhelli, Beauchamp, and Wayne testified consistent with Travier regarding his parole absconding, his turning himself in, and the particulars of the phone calls placed to defendant. Callahan confirmed that she had been in the vehicle when defendant and Williams discussed with Travier the need to eliminate Farris. While Travier has been convicted of several felonies during his lifetime, he readily admitted to being imprisoned, a fact that was also explored on cross-examination. In any event, the issue of Travier's credibility was one for the jury. *Unger*, 278 Mich App at 222. Thus, defendant has not established any error warranting relief.

There is also no evidence that the police or prosecution intimidated Callahan into testifying or testifying falsely. On the contrary, Callahan testified that members of defendant's extended family impliedly threatened her were she to testify. Moreover, Callahan actually testified somewhat in favor of defendant, denying that she ever heard or saw Farris speak to authorities while in jail regarding the Dutton Street or Quick Stop shootings. Accordingly, defendant's claim on this issue is without merit.

Defendant takes issue with the prosecutor's statement, made during closing argument, wherein he said: "And every time he pulled that trigger, what was he trying to do? He was trying to kill Jheryl Wright, and he accomplished his objective." This statement certainly does not constitute prosecutorial misconduct. "[T]he prosecutor is free to argue the evidence and all reasonable inferences arising from it." *Thomas*, 260 Mich App at 454. There was testimony that at least six shots were fired at Wright, and the prosecutor did not improperly state the law regarding intent nor imply some special knowledge of defendant's guilt. In any event, the jury was instructed that the prosecutor's statements were not evidence, and jurors are presumed to follow their instructions. *Unger*, 278 Mich App at 235. Accordingly, defendant is not entitled to relief on this claim.

Finally, because none of defendant's claimed errors on the part of the prosecution warrant relief, his claim of cumulative error fails.

## F. TRIAL COURT ERRORS

Defendant asserts that the trial court erred by allowing the prosecution to introduce improperly noticed prior bad acts evidence and by failing to conduct a proper inquiry into whether defendant waived his right to testify.[16]

Defendant asserts that the prosecution presented evidence of his prior bad acts, i.e., his possible involvement in the Dutton Street shooting, without proper notice as required by MRE 404(b). However, as discussed, the prosecution introduced this evidence under the res gestae exception, which falls outside the procedural strictures of MRE 404(b). *Robinson*, 128 Mich App at 340. Accordingly, defendant's claim is without merit.

Immediately prior to resting, defense counsel told the trial court, "Your Honor, as the Court knows, an accused has the right to either testify or not testify under our state and federal constitution, and my client has indicated to me that he wishes to exercise his right to not testify." There is no indication in the record that defense counsel spoke against defendant's wishes. Nonetheless, defendant argues that the trial court erred in failing to question him to determine whether he knowingly and voluntarily waived his right to testify in his own defense. Certainly,

---

[16] "We review for an abuse of discretion a trial court's decision regarding the admission of evidence." *Katt*, 248 Mich App at 289. Whether defendant's due process rights were violated is reviewed de novo. *Steele*, 283 Mich App at 478.

conducting such a colloquy is the better practice, if only to prevent later challenges on appeal. However, this Court has held that "there is no requirement in Michigan that there be an on-the-record waiver of a defendant's right to testify. . . . [T]he trial court ha[s] no duty to advise [a defendant] of the right, nor [is] it required to determine whether [a defendant] made a knowing and intelligent waiver of that right." *People v Harris*, 190 Mich App 652, 661-662; 476 NW2d 767 (1991). Thus, defendant's argument is without merit.

## G. CUMULATIVE ERROR

Finally defendant argues the cumulative effect of the asserted trial court errors deprived him of a fair trial. "We review this issue to determine if the combination of alleged errors denied defendant a fair trial." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007). "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence is the reliability of the verdict before a new trial is granted." *Id*. "Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *Id*. There being no error in this case apart from the possible ineffective assistance counsel, defendant cannot establish that any cumulative effect deprived him of a fair trial.

## III. CONCLUSION

We affirm defendant's conviction and sentence for solicitation to commit murder. With regard to defendant's convictions for first-degree murder and felony-firearm, we reverse the trial court's denial of his motion for a *Ginther* hearing, limited to the issues described in this opinion, and remand for such a hearing.[17] We reject all of defendant's other claims of error. We retain jurisdiction.

/s/ Jane M. Beckering
/s/ Jane E. Markey
/s/ Douglas B. Shapiro

---

[17] Following this hearing, defendant may renew his motion for a new trial on the basis of ineffective assistance of counsel.

-21-

# Court of Appeals, State of Michigan

## ORDER

People of MI v Clarence Edward Ross

Docket No. 321353

LC No. 2012-001925-FC

Jane M. Beckering
Presiding Judge

Jane E. Markey

Douglas B. Shapiro
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings in this matter shall commence within 56 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, the trial court shall conduct an evidentiary hearing pursuant to *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973), limited to the issue whether trial counsel rendered ineffective assistance by failing to secure two eyewitnesses to the Quick Stop shooting. The record created on remand shall include the testimony of eyewitnesses Singh and Stanfill, if possible, as well as defense counsel's rationale for not attempting to secure the presence of Singh and Stanfill at trial. Defendant may renew his motion for a new trial on the basis of ineffective assistance of counsel following the evidentiary hearing. The trial court is to make findings of fact and a determination on the record.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand. The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings. Appellant may file a supplemental brief pertaining to the issue raised on remand within 21 days after entry of the trial court's order deciding the matter or 21 days after the transcript of the hearing is filed, whichever is later. Appellee may file a supplemental brief in response.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

JUN 30 2015

Date

Chief Clerk