# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
October 18, 2018

Plaintiff-Appellee,

v

No. 339629
Wayne Circuit Court
LC No. 16-001641-01-FJ

BRYSON DEION SAUNDERS,

Defendant-Appellant.

Before: O'BRIEN, P.J., and K. F. KELLY and FORT HOOD, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of two counts of first-degree criminal sexual conduct ("CSC-I") (multiple variables), MCL 750.520b. Defendant was sentenced to concurrent terms of 25 to 50 years' imprisonment for the two CSC-I convictions. We affirm.

This case arises out of the sexual assault of the victim, a 12-year-old girl, on July 18, 2002 in Detroit, Michigan. The victim was riding her bicycle home alone from a local Burger King after ordering food for her family. As the victim passed by a group of four young men, one of the men saw a $5 bill sticking out of the victim's back pocket and stole it as she was riding past him. The victim turned around and demanded that the man give her money back. In response, the man and his companions dragged the victim off of her bicycle and into a vacant field nearby. The men took turns penetrating the victim orally and vaginally. When one of the men forced his penis into the victim's mouth, she bit his penis to get the sexual assault to stop. The man punched the victim in the head. The victim's case remained unsolved until 2015, when a rape kit taken following the sexual assault was tested as a result of efforts made by the Wayne County Prosecutor's Office to test backlogged rape kits. DNA from vaginal swabs in the rape kit were matched to defendant's DNA, which was on file in the combined DNA index system ("CODIS"), a system used to document DNA profiles and match them to DNA samples found at crime scenes.

Before trial, defendant moved to dismiss the charges against him, arguing that his due process rights had been violated by the suppression of evidence and the failure to preserve

evidence. Following a hearing, the trial court denied the motion.[1] Defendant now appeals as of right.

## I. DUE PROCESS

Defendant argues that his due process rights were violated because the Detroit Police Department failed to preserve evidence that was crucial to his defense. Similarly, defendant alleges that evidence was withheld from him during the lower court proceedings. We disagree.

A defendant's claim that he was denied due process is reviewed de novo. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). "A trial court's denial of a request for an evidentiary hearing is reviewed for an abuse of discretion. An abuse of discretion occurs when a court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v White*, 307 Mich App 425, 429; 862 NW2d 1 (2014) (citations omitted).

In *People v Chenault*, 495 Mich 142, 149-150; 845 NW2d 731 (2014), the Michigan Supreme Court set forth the applicable principles to guide a court's inquiry when a defendant alleges a violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963):

> The Supreme Court of the United States held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 US at 87. . . .
>
> *   *   *
>
> [T]he components of a "true *Brady* violation," are that: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material. [citing *Strickler v Greene*, 527 US 263, 281-282; 119 S Ct 1936; 144 L Ed 2d 286 (1999).]

The thrust of defendant's argument on appeal is that his due process rights were violated where the Detroit Police Department failed to retrieve and preserve a number of different pieces of evidence. A defendant can only successfully obtain the reversal of a conviction under such alleged circumstances if he can establish that the evidence at issue was exculpatory, or "that law enforcement personnel acted in bad faith." *People v Dickinson*, 321 Mich App 1, 16; 909 NW2d 24 (2017) (citation and quotation marks omitted). Similarly, in *Arizona v Youngblood*, 488 US 51, 58; 109 S Ct 333; 102 L Ed 2d 281 (1988), the United States Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." The burden is on defendant to show that the evidence was exculpatory or that bad faith on the part of the police led to the mishandling of the evidence. *Dickinson*, 321 Mich App at 16.

---

[1] Defendant also moved for an evidentiary hearing, which the trial court denied.

Defendant first contends that the police violated his due process rights by failing to properly preserve the victim's underwear, which were found in the field where she was sexually assaulted on the day after she reported the assault. Defendant argues that the underwear could not be properly tested for DNA because it was left out in rainy weather overnight, and that this evidence was potentially exculpatory because it could have been tested for seminal fluid that would have aided in the effort to exonerate him. However, defendant offers no evidence showing that testing the underwear for DNA would have been exculpatory, given that a vaginal swab tested positive for defendant's DNA. Moreover, the record indicates that the victim did not put her underwear back on after the sexual assault, and the likelihood is slim that any usable DNA from her attackers would have been found even if the police had discovered and tested the underwear before it was potentially damaged in the rain. Further, defendant offers no evidence to show that the failure to retrieve the underwear before it rained was motivated by bad faith on the part of the police. At most, the record shows that the victim threw her underwear across the field in anger and that it was discovered while the crime scene was being processed the following day. The fact that it rained overnight was not a factor that the police could control, and the quick processing of the crime scene and collection of evidence after the sexual assault was reported does not support a finding that the officers acted in bad faith. Thus, defendant's due process rights were not violated. *Chenault*, 495 Mich at 150; *Dickinson*, 321 Mich App at 16.

In a cursory fashion, defendant also faults the police for withholding information that another individual, Troy King, had been charged in this case in 2002, and that the victim's identification of King was "9 on a 10 point scale." In his motion to dismiss, defendant acknowledged that the prosecution received this information at the same time defendant did. In its response, the prosecution contended that defendant was provided information about King's arrest in the initial discovery packet provided to defense counsel on February 19, 2016 and May 10, 2016. Additional details concerning the victim's identification of King were provided to defense counsel on January 30, 2017, after the prosecution received the information from the police on January 27, 2017. In any event, defendant does not elaborate how this evidence was in any way exculpatory to him, particularly where the victim alleged that four men participated in the sexual assault. *Chenault*, 495 Mich at 150. Moreover, there is no indication in the record that the police acted in bad faith in tendering this evidence to defendant. *Dickinson*, 321 Mich App at 16.

Defendant also argues that the police violated his due process rights by failing to test a used condom, found at the scene, for 14 years. Defendant believes this evidence could have been exculpatory. The record reflects that when the condom was tested in 2016, the DNA found on it did not match defendant's DNA. In response to defendant's motion to dismiss, the prosecution asserted that defendant was provided with the results of the testing of the condom on July 26, 2016. However, even accepting defendant's contention that defense counsel received this evidence shortly before filing the motion to dismiss, the fact that it did not match defendant's DNA is not necessarily exculpatory, particularly where the record reflects that four men sexually assaulted the victim. Therefore, even where the DNA on the condom was not a match for defendant's DNA, it could still have been a match for any of the other three men who engaged in the sexual assault. However, "[a]bsent a showing of suppression of evidence, intentional misconduct, or bad faith, the prosecutor and the police are not required to test evidence to accord a defendant due process." *People v Coy*, 258 Mich App 1, 21; 669 NW2d 831 (2003) (citation omitted). Defendant failed to show that intentional misconduct or bad faith

led to the delay in testing for DNA evidence, or that the evidence was intentionally suppressed. Thus, his right to due process was not violated.

Defendant next argues that his due process rights were violated because the police failed to retrieve surveillance footage from the Burger King that the victim went to before the sexual assault, as well as a Chrysler facility where she reported the sexual assault after chasing her attackers following the assault. At trial, Detroit Police Department Corporal James Wiencek testified that he viewed the surveillance video from Burger King to determine the approximate time that the victim was sexually assaulted and to see if the surveillance video indicated whether any suspects had followed the victim into or from the Burger King. Corporal Wiencek did not retrieve the surveillance video, because after viewing it he determined that it did not hold "evidentiary value" for the police investigation. For reasons unclear from the record, the police did not secure surveillance video from the Chrysler facility. However, there is nothing in the record to suggest that the police were acting in bad faith when they failed to secure the surveillance video from Burger King and the Chrysler facility. Thus, where the failure to obtain the video surveillance evidence was not the product of bad faith on the part of the police, defendant's due process rights were not violated. *Youngblood*, 488 US at 58.

Defendant also takes issue with the investigatory tactics used by the police following the victim's sexual assault. Defendant argues that his right to due process was violated because the police did not collect DNA samples from five potential suspects. As previously discussed, this Court has found that, "unless the defendant can show the suppression of the evidence, intentional misconduct, or bad faith, the prosecutor and the police are not required to perform DNA testing to satisfy due process." *Dickinson*, 321 Mich App at 16. Defendant has not proffered evidence that the police chose not to take DNA samples from the five suspects in bad faith. Moreover, it is highly unlikely that performing such DNA tests would have been potentially useful or exculpatory, particularly where the vaginal swab taken from the victim tested positive for defendant's DNA and the sexual assault giving rise to this appeal was committed by multiple individuals. We are therefore not persuaded that defendant's due process rights were violated.

Additionally, defendant argues that his due process rights were infringed upon because the police decided to use a photographic array instead of a live lineup of the aforementioned five suspects to assist the victim in identifying her attackers. During her trial testimony, Detroit Police Department Detective Carla Williams testified that a photographic array was conducted in accordance with the usual procedures employed by the Detroit Police Department in July 2002 when this case was being initially investigated. Where there is no indication in the record that the police acted in bad faith in presenting the victim with the photographic array, we are not persuaded that defendant's due process rights were violated. *Youngblood*, 488 US at 58.

Defendant also challenges the fact that the victim's statement from July 2002 was not provided to the defense until "days before trial." However, the record reflects that the full police jacket possessed by the Detroit Police Department, which included the statement at issue, was not located and provided to Detroit Police Department Detective Renee Lavasseur[2] and the

_____

[2] The record reflects that Detective Lavasseur began to investigate this case in late 2015.

prosecution until January 2017. As a result, during a hearing held on January 25, 2017 the trial court adjourned trial until March 13, 2017 to allow the defense additional time to review the evidence. Under such circumstances, we are not persuaded that a due process violation occurred. *Chenault*, 495 Mich at 149.

Finally, defendant challenges the failure of the Detroit Police Department to interview (1) two Chrysler employees, Mike Craft and Charles Chapman, concerning their identification of the assailants,[3] or (2) Taranz Jenkins, an individual that was identified by a Burger King employee as matching the description of one of the assailants. While the record reveals that the police investigation in 2002 may have been less than thorough, there is nothing in the record to suggest that any such omissions were undertaken in bad faith. Moreover, as the trial court aptly noted, defense counsel was given the opportunity to thoroughly question the police witnesses concerning how they handled this case, and any frailties in the underlying investigation were fully presented to the jury for its consideration. Under such circumstances, particularly where there is no indication in the record that the prosecution or the police acted in bad faith, we are not persuaded that defendant's due process rights were in any manner undermined. Put simply, this case cannot be characterized as one where the record supports a conclusion that the prosecution or the police "engaged in gamesmanship or . . . a deliberate attempt to conceal evidence." *People v Greenfield* (*On Reconsideration*), 271 Mich App 442, 454 n 9; 722 NW2d 254 (2006). Accordingly, the trial court properly denied defendant's motion to dismiss, as well as his motion for an evidentiary hearing.

## II. OFFENSE VARIABLES

Defendant next challenges the trial court's assessment of points for offense variables ("OVs") 3, 7, and 8. For the reasons set forth below, defendant's challenges are without merit.

"A trial court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Gloster*, 499 Mich 199, 204; 880 NW2d 776 (2016). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).

### A. OV 3

Defendant first argues that the trial court should not have assessed points 10 points pursuant to OV 3 because the victim did not sustain physical injuries requiring medical treatment. We disagree.

---

[3] During trial, Detective Williams recalled that an unnamed security guard may have seen the victim walking by the Chrysler facility, "but not necessarily . . . what happened to her." Additionally, Detective Lavasseur testified that when this case was reopened, she unsuccessfully attempted to contact Chapman and Craft.

OV 3 addresses physical injury to the victim, and provides for an assessment of 10 points for "bodily injury requiring medical treatment[.]" *People v Armstrong*, 305 Mich App 230, 245; 851 NW2d 856 (2014), quoting MCL 777.33(1)(d). "[B]odily injury encompasses anything that the victim would, under the circumstances, perceive as some unwanted physically damaging consequence." *People v McDonald*, 293 Mich App 292, 298; 811 NW2d 507 (2011). The prosecution correctly asserts that, where an individual has been sexually assaulted, even minor physical trauma or injury and precautionary medical treatment can constitute the type of bodily injury requiring medical treatment sufficient to support assessing OV 3 at 10 points. *Id*. at 298. Specifically, in *McDonald*, while the victim did not "suffer any acute physical trauma or injury as a result of the [sexual assault] and most of the medical treatment [the victim] received was precautionary[,]" the victim was treated for an infection incurred "as a consequence of the [sexual assault]." *Id*.

Dr. Joseph Benjamin, the physician who examined the victim following the sexual assault, testified that he examined the victim's genitals as part of the sexual assault examination. Dr. Benjamin observed that the victim had two small bruises located in the interior of her vagina, which "indicate[d] . . . there was [a] kind of injury [that] happened to her[,]" most likely caused by vaginal intercourse. During cross-examination, Dr. Benjamin testified that the bruising inside of the victim's vagina was consistent with her having experienced trauma from a sexual assault. Dr. Benjamin also prescribed the victim prophylactic medications to ensure that she did not contract a sexually transmitted disease ("STD"). The victim was also given an emergency contraceptive to prevent pregnancy. Under such circumstances, the trial court correctly assessed 10 points for OV 3.

## B. OV 7

Defendant contends that the trial court erred by assessing 50 points for OV 7 because the victim was not subjected to excessive brutality when she was sexually assaulted. We disagree.

Offense variable 7 is to be assessed at 50 points if "[a] victim was treated with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). The trial court in this case assessed 50 points pursuant to OV 7, and found that "the testimony support[ed] excessive brutality. . . . [T]he behavior was such that it was violent and it was forceful. Not only was [the victim] assaulted by one individual, she was sexually assaulted by multiple individuals." While MCL 777.37 does not define "excessive brutality," this Court, referring to dictionary definitions, has defined it as "savagery or cruelty beyond even the 'usual' brutality of a crime." *People v Rosa*, 322 Mich App 726, 743; 913 NW2d 392 (2018). With regard to the level of severity required to assess 50 points under OV 7, the perpetrator's conduct must also be "intended to make a victim's fear or anxiety greater by a considerable amount." *Hardy*, 494 Mich at 444.

In this case, the victim was 12 years old at the time of the assault and was riding her bicycle home alone. The four men, including defendant, blocked the sidewalk, forcibly removed the victim from her bicycle and dragged her to a vacant field, where they proceeded to hold her down and take turns penetrating her orally and vaginally. Throughout her assault, the victim was held down and repeatedly penetrated by two men at once. While the sexual assault was ongoing, the men ate all of the food that the victim purchased at Burger King for her family. Additionally,

when the victim attempted to bite the penis of one of the men to get him to stop sexually assaulting her, he punched her in the head. At one point during the assault when the victim tried to get up and escape, the assailants pushed the victim back down and told her, "we're not done." When the victim tried to get up and escape a second time, she was pushed down onto her back. In our view, these circumstances reflect that the victim, a child at the time of the assault, was subjected to a level of brutality great enough to be considered "excessive" under MCL 777.37(1)(a). Therefore, the trial court did not err by assessing 50 points for OV 7.[4]

## C. OV 8

Finally, defendant faults the trial court for assessing 15 points for OV 8 because the victim was not transported to a place of "greater danger" with the intention of concealing the crime. We disagree.

OV 8 states that the trial court may assess 15 points when "[a] victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." *People v Barrera*, 500 Mich 14, 15; 892 NW2d 789 (2017), quoting MCL 777.38(1)(a). The term "asported" is not defined in MCL 777.38. In *Barrera*, the Michigan Supreme Court concluded that "[a] plain reading of asportation is this: If a victim is carried away or removed to another place of greater danger or to a situation of greater danger . . . the statutory language in satisfied." *Barrera*, 500 Mich at 21 (quotation marks omitted).

The trial court determined that an assessment of 15 points for OV 8 was proper because "[d]efendant and [the victim were] on a public street. At some point [the victim] chased [the men and] was [dragged] into a grassy area which would create a situation of greater danger." The record amply supports the trial court's finding where the testimony at trial reflected that when the victim stopped her bicycle and demanded that the men return the money that they snatched from her pocket, she was dragged into a vacant field with tall grass away from the public sidewalk and sexually assaulted there. As in *Barrera*, the trial court in this case "could reasonably determine by a preponderance of the evidence that the victim was 'removed' to a location where the sexual assault was less likely to be discovered[.]" *Barrera*, 500 Mich at 22. Under these circumstances, we are satisfied that this offense variable was properly assessed at 15 points.

---

[4] Where the victim testified at trial that she was repeatedly penetrated orally and vaginally by the four men who accosted her, defendant's assertion on appeal that he did not participate in the acts amounting to "excessive brutality" as contemplated by MCL 777.37, and his reliance on this Court's decision in *People v Hunt*, 290 Mich App 317, 324-326; 810 NW2d 588 (2010) are unavailing.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood